821 A.2d 1139

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. CRAIG TYLER, A/K/A CRAIG D. TYLER,
DEFENDANT–APPELLANT.

Argued February 19, 2003—Decided May 13, 2003.

*Alan I. Smith,* Designated Counsel, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Teresa A. Blair,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Acting Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

COLEMAN, J.

The critical issue raised in this appeal is whether the trial court erred in not excusing a juror based on juror prejudice either before or after the jury had been sworn. The trial court found that although the juror was unfit to serve based on prejudice and bias, the juror should not be excused until she had served one day because the court believed the juror had tried to avoid jury duty in a two-day trial. The Appellate Division affirmed, finding that "[n]o prejudice to defendant has been shown." We reverse and hold that the trial court did not properly perform its gatekeeping role.

I.

Defendant was indicted for third-degree possession of heroin, third-degree possession of heroin with intent to distribute and third-degree possession of heroin with intent to distribute within a school zone. The indictment was based on observations allegedly made by New Brunswick Police Officer Victor DeFilippo while on bicycle patrol on August 2, 1999. The case was assigned to a single judge for pretrial management and trial. The appeal focuses on the jury selection process and the events immediately preceding the jury voir dire that contributed to the atmosphere in which the jury selection process was conducted.

Defendant was represented by the Office of the Public Defender, which made several applications to adjourn scheduled trial dates. Trial was eventually scheduled to begin on July 18, 2000. On July 17, 2000, defendant sought leave of court to change his counsel and to adjourn the trial to allow time for preparation by new counsel. Defendant apparently had had substance abuse and psychiatric problems for a number of years and previously had

appeared before the presiding judge. When defendant made the application for a change of attorney, he had been laboring under the misconception that July 18 was to be a pretrial conference and had failed to prepare for trial. Defense counsel informed the court that he was "categorically ... unprepared for trial."

In denying the motion for an adjournment, the trial court stated:

Well, Mr. Tyler, I'm afraid that if we waited until you're prepared, I would be retired. I note, Mr. Tyler, you've been before me on a number of occasions, and I note you stood there and you said I don't want to go to trial. I don't want to plead. I don't want to go to trial and I don't want to plead. And I said, well, those are the only two alternatives, choices that you have. I couldn't think of another one. The prosecutor didn't want to dismiss the case.

So we finally back on February 28th set this matter down for trial. And then we had a trial date on May 22nd which you adjourned. So the trial memorandum was signed on February 28. This is now July 17th. Why aren't you ready?

THE DEFENDANT: I'm not ready, and also my, my attorney can't be ready either because he knows nothing about my trial.

THE COURT: That's not my problem, Mr. Tyler. That's your problem. . . .

. . . .

I don't care if Mr. Tyler wants to retain anybody as long as they're here tomorrow morning to pick a jury in this matter.

If this was not a defendant that I had a great deal of experience with, if this was not a defendant who sat here and hemmed and hawed, didn't want to go to trial, didn't want to plead, who sent me letters.

After the application to adjourn the case was denied, the new attorney (who would have represented defendant if the application had been granted) informed the court that he would not be trial counsel. The court then stated that although defendant is very dependent, "I'm not his mother. I'm a judge."

The next day, July 18, defendant again raised the issues of changing counsel and being unprepared for trial because he had not understood the trial schedule. The trial judge "[didn't] care whether [he] misunderstood," and found "nothing to discuss." The judge gave defendant "the option of sitting down" and letting assigned counsel represent him, or being held in contempt of court. The judge apparently was so aggravated with defendant throughout the day, that she threatened him with contempt

charges on three more occasions *if* he: (1) said "another word," (2) became "disruptive" during trial, or (3) attempted to make contact with any juror. The court rejected defendant's request for self-representation prior to the start of the jury selection process.

After the first panel of potential jurors was brought into the courtroom, the judge instructed the group that "the purpose of a voir dire ... [was] to select a jury ... without any bias, ... prejudice, [or] preconceived ideas." The judge instructed the potential jurors to request a sidebar meeting by raising their hands if any of them had a concern with respect to a personal bias or prejudice that he or she did not wish to discuss in open court.

Juror number 424 (A.C.) was among the first fourteen potential jurors to be seated in the jury box. During the initial stages of voir dire the judge asked all of the jurors if anything about the charges would prevent anyone from "making a fair and impartial decision" and A.C. did not raise her hand. When the judge asked if any juror had someone close to him or her accused of a crime, A.C. indicated that she would like to speak to the judge at sidebar. At sidebar, A.C. stated that she had accused her father of sexual abuse and that he had been prosecuted for that offense eight years earlier. A.C. stated that she did not know if that experience would have the capacity to affect her as a juror but that she could "listen with an open mind." Although the judge excused twelve potential jurors for cause because they lacked the ability to be fair and impartial, A.C. was not one of them.

Following a lunch break, the judge's last question to the potential jurors, before counsel for the parties had an opportunity to exercise any peremptory challenges, was: "[I]s there any reason best known to you now that you've had an opportunity to search your own conscience as to why you could not or should not serve as a juror in this case?" No potential juror responded. After the assistant prosecutor had used five peremptory challenges and defense counsel had used four such challenges, the jury panel was exhausted. The judge then asked defense counsel whether defen-

dant would accept a jury of thirteen people and defense counsel said no.

Before the judge brought another panel of prospective jurors to the courtroom, juror number 642 (G.B.) raised her hand and asked if she could speak to the judge at sidebar. The judge responded by stating, "No. I've been wanting to say that all day." Another recess was held and then an additional panel of jurors was brought to the courtroom. After several more prospective jurors seated in the box were excused and a number of new potential jurors were questioned, both the State and defense counsel were satisfied with G.B. and the other thirteen jurors then seated in the jury box. At that time, the State had used five challenges and defense counsel had used eight. The jury was then sworn.

After the jury had been sworn, but before the opening statements had been made, A.C. and G.B. indicated that they would like to speak with the judge. The following colloquy occurred outside of the presence of the jury:

The Court: You want to talk to me? Okay. You can't do that except in front of everybody, but that's all right. You both want to talk to me?

Juror [A.C.]: Yeah. Because I thought you'd ask us more questions and it wouldn't be like a final jury, but I'm—

The Court: Let's place your name—

Juror: [A.C.]

The Court: [A.C.], what do you want to tell us?

Juror [A.C.]: I have a big financial problem.

The Court: You have a big financial problem that—

Juror [A.C.]: I don't get paid at all and I'm supposed to go for another job interview tomorrow and if I don't get this job I'm going to be—

The Court: Well, I think when you leave here you better call right away and see whether you can reschedule your appointment for your interview later on in the day.

Juror [A.C.]: Yeah. I know, but bills-wise, like I wouldn't be able to afford to pay my bills.

The Court: Miss [A.C.], I'm sure at some point I asked you whether you knew a reason you could not serve in this matter.

The Court: And your name?

Juror [G.B.]: [G.B.].

. . .

The Court: What is your problem?

Juror [G.B.]: Just the fact the law office is understaffed at the time, I'm dealing with criminal cases all day long, and I don't think I can be—

The Court: I know.[your employer] and he will understand.

Juror [G.B.]: No he won't. Actually he asked me to pull you guys aside. When I raised my hand he told me—

The Court: You go back and you tell [your employer] if he has any questions about it that [the judge] would be more than happy to speak to him about it. He is an attorney.

Juror [G.B.]: Yes, he is.

The Court: He is an officer of this Court. He well understands the importance of a jury. This is going to be a rather brief trial. If you want to go in after four o'clock to assist [your employer]—

Juror [G.B.]: I'm the only secretary there working on the criminal trials. If anything else goes on in the office the other secretary, she's doing real estate.

The Court: Miss [G.B.], [your employer's] practice is not my concern and, as I said, I would be more than happy to speak to him. You can tell that he'd be more than—

Juror [G.B.]: *I'm dealing with crimes all day long and I can't have an unbiased opinion of the whole case.*

The Court: *I don't believe you, Miss [G.B.]. You had many occasions—*

Juror [G.B.]: *I raised my hand. You didn't let me. Having an opinion doesn't—*

The Court: *Miss [G.B.], I will expect you tomorrow morning at nine o'clock.*

Juror [G.B.]: *Fine. I'll be here. No problem.*

(Jurors [A.C. and G.B.] left the courtroom.)

The Court: Obviously—I note it's four minutes to four. I have been talking just about nonstop since nine o'clock this morning or 9:30 when I came out on the bench. I am obviously very tired. I really—my patience is at an end with some—some jurors. I've done my best, but I am only human.

Miss [G.B.] obviously knows how to push the buttons about not being fair. I want her to come back tomorrow and I may keep her. I may excuse her before the end of the case since she has expressed an opinion that she could not be fair albeit after she was sworn in this case.

[Defense Counsel]: True, judge, she did express racial bias, so it seemed she should be inappropriate to sit on the jury.

The Court: Yes, I agree with you. We do not want anybody who has any bias whether they express it or not or for whatever purposes, so she will not be a deliberating juror, but it will—I can promise counsel that she will not be a deliberating juror. Whether or not I keep her here for the purposes of administering some sanctions to her I'll think about it overnight when I'm a little more rested. In the morning I'll make my determination.

[Emphasis added.]

The next morning, before the jurors took their seats in the jury box, defense counsel asked the judge for permission to make a statement about A.C. and G.B. on the record. Prior to his statement, the judge reiterated the events from the previous afternoon. With respect to G.B., the judge stated:

I indicated that I would not excuse her but that I would be happy to speak to her employer . . . . Only then I would term her actions hysterical, indicated that she did not want to sit. She didn't think she could be fair and that she was racially prejudiced. She threw that out and which I interpreted as a desperate attempt to get out of the jury trying to find the magic words that would release her from jury service. Certainly, at four o'clock in the afternoon after an exhausting day I was not in any position to deal with her little tantrum. I instructed her to return this morning. *It is my present intention to have Ms. [G.B.] sit all day and listen to this jury and to, as a sanction to her in accordance with Rule 1:10–1, sanction her whereby I think that she has been contemptuous of this court. She has disrupted these proceedings and that at the end of the day I am going to admonish her and let her go.* I obviously would not let her sit as a deliberating juror in this matter. Whether she is racially biased in any way, whether she could not be fair, I have no way of knowing. I interpreted what she said to me, as I said, as a desperate hysterical attempt to get off the jury. In any event, she will not sit on this jury but she will sit in my courtroom today.

[Emphasis added.]

Defense counsel objected to continuing with either A.C. or G.B. in the jury box, and moved for a mistrial or a stay to permit an interlocutory appeal. He questioned A.C.'s ability to function as a deliberating juror because, after the judge's morning voir dire of A.C. at sidebar with respect to her sexual abuse by her father, A.C. had been obviously upset, and perhaps crying, for the balance of the previous day. The judge disagreed with defense counsel's assessment because the judge had observed no such signs of distress and was "in a much better position to see and look at those jurors in the jury box." She therefore refused defense counsel's request to inquire of A.C. whether she was able to continue and whether she could be fair and impartial.

The judge also rejected defense counsel's contention that G.B.'s continued presence on the jury had the potential of "infecting the entire panel" if she became "hysterical" and made remarks concerning her "prejudice" in the other jurors' presence. The judge philosophized that "[r]eally, you can't isolate jurors from contami-

nation by anyone[,]" and concluded that an instruction that the jurors were not to discuss the case amongst themselves and were to report any incidents to the contrary would suffice. Part of the reasoning for denying the application was because the judge had no interest in "go[ing] through another horrendous day of selecting a jury" for defendant's one-day trial.

G.B. was then brought into the courtroom and the judge addressed her out of the presence of the other jurors. The judge informed G.B. that she would have to sit with the jury for one day as a sanction and that she would then be excused. The judge explained:

> The Court: But, Ms. [G.B.], all day long you listened as I questioned the jurors and you expressed none of this to me?
>
> Ms. [G.B.]: I did raise my hand and I did ask for a side bar.
>
> The Court: Right before you were excused for the lunch hour. Thereafter, you did not renew any indication that you wanted to speak to me and I ask the general question is there any reason best known to you why you could not or should not sit as a juror and you did not. . . .
>
> The Court: After you were a sworn juror to then come up there and indicate that you were racially biased, you couldn't be fair. I'm not going to reward you by excusing you from jury service.
>
> Ms. [G.B.]: Okay.
>
> The Court: What I am going to do, Ms. [G.B.], because I couldn't possibly permit you to sit as a deliberating juror on this case, you have expressed for whatever reasons you did that I don't know whether they're truly how you feel or that is what you wanted to say in order to get off the jury, and believe me, over the years I have listened to a lot of people say a lot of silly things in order to get off a jury but what I am going to do is I am going to ask that you sit in that chair and you listen to this trial.
>
> Ms. [G.B.]: Okay.
>
> The Court: —for the entire day. When I excuse the jury for the day you will be excused from further service on this jury.
>
> Ms. [G.B.]: Okay.
>
> The Court: Now, I am instructing you, and this is an order of the Court, that you're to have no conversation with any other member of this jury regarding this case or regarding your service.
>
> Ms. [G.B.]: Okay.
>
> The Court: You're not to tell them that you were just sitting here as a sanction for your behavior. You're not to tell them that you will not be sitting here tomorrow.
>
> Ms. [G.B.]: Okay.

> The Court: You are just to sit and you are to listen and to have no contact with other juror members.
>
> . . .
>
> [Defense Counsel]: Your Honor, I'd appreciate it if you would inquire of this juror as to what conversations, if any, she had with Ms. [A.C.] after they exited the jury room or exited the courtroom.
>
> . . .
>
> Ms. [G.B.]: There wasn't any conversation. . . .

After opening statements, Officer DeFilippo testified regarding the circumstances of defendant's arrest on August 2, 1999, for drug offenses. Defendant stipulated that the drug recovered was heroin. The State presented expert testimony that the packaging and quantity of the heroin and the currency denominations recovered from defendant at the time of his arrest were consistent with possession with intent to distribute. Defendant testified and disputed Officer DeFilippo's version of the circumstances of his arrest. He denied possession of the heroin and asserted that the officer found it on the ground and wrongfully accused him of possessing it. He stated that the cash found on him came from his $480 Social Security disability check. G.B. was excused from further jury duty at the conclusion of the second day of trial.

The jury found defendant guilty as charged. The judge sentenced defendant to an extended term of seven years with three years of parole ineligibility after a proper merger. The Appellate Division affirmed in an unpublished opinion. We granted defendant's petition for certification, 172 *N.J.* 359, 798 *A.*2d 1272 (2002), and now reverse.

## II.

Defendant argues that he was deprived of a fair trial when the judge permitted a biased juror to remain on the jury after that juror informed the court that she was not impartial. He contends that the presence of an "outcast juror" infected the jury's interactions, thereby depriving him of a fair and impartial jury. He maintains that the potential prejudicial impact was enhanced when the trial judge failed to instruct A.C. not to discuss with other

jurors the prejudicial remarks A.C. heard G.B. make at sidebar and not to permit those remarks to influence A.C.

## A.

 The starting points for analyzing defendant's claims are the Sixth Amendment of the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution. Those similarly worded provisions ensure that " 'everyone charged with [a] crime has an absolute constitutional right to a fair trial in an atmosphere of judicial calm, before an impartial judge and an unprejudiced jury.' " *State v. Marchand,* 31 *N.J.* 223, 232, 156 *A.*2d 245 (1959) (quoting *State v. Rios,* 17 *N.J.* 572, 590, 112 *A.*2d 247 (1955)). "The securing and preservation of an impartial jury goes to the very essence of a fair trial." *State v. Williams,* 93 *N.J.* 39, 60, 459 *A.*2d 641 (1983) (citations omitted). Trial judges in their gatekeeping role have a duty "to take all appropriate measures to ensure the fair and proper administration of a criminal trial," including "preserv[ing] the jury's impartiality throughout the trial process." *Id.* at 62, 459 *A.*2d 641 (citations omitted). That high responsibility is placed on trial judges because the jury selection process is an integral part of the fair trial procedures to which every defendant charged with criminal wrongdoing is guaranteed by both the federal and state constitutions. *See State v. Czachor,* 82 *N.J.* 392, 404, 413 *A.*2d 593 (1980). To ensure impartiality, jurors must even be protected from judicial influence. *State v. R.D.,* 169 *N.J.* 551, 557, 781 *A.*2d 37 (2001) (quoting *State v. Bey,* 112 *N.J.* 45, 75, 548 *A.*2d 846 (1988)). That is so because judicial conduct has the capacity to affect the composition of a selected jury and upset the deliberative process. Therefore, "judicial conduct ... must be carefully scrutinized" in relation to jury empanelment. *See State v. Hightower,* 146 *N.J.* 239, 253, 680 *A.*2d 649 (1996).

## B.

██ The problems presented in this case could have been avoided in two ways if the trial court properly had performed its

gatekeeping function. First, when G.B. sought the court's attention just prior to the time when a second panel of prospective jurors was brought to the courtroom, the court could have brought G.B. to sidebar to hear what she later told the court and counsel. If that had been done, defense counsel could have used one of his remaining two peremptory challenges to remove her if the judge declined to excuse her for cause. *See Rule* 1:8–3(d).

Second, *Rule* 1:8–2(d)(1) provides that "[i]f a juror is excused after being sworn but before opening statements begin, another juror may be impanelled and sworn, but no juror may be impanelled and sworn thereafter." It is clear in this case that G.B. revealed her prejudice and bias after the jury had been sworn but before opening statements were made. The judge agreed with defense counsel that G.B. "did express racial bias, so it . . . [would] be inappropriate [for her] to sit on the jury." Therefore, the judge could have removed G.B. for cause after the jury had been sworn and before the opening statements. If that had been done, there would have been no risk of prejudice especially because a number of other prospective jurors had been removed because of an inability to be fair and impartial.

Contrary to the State's assertion, actual prejudice need not be shown. In *State v. Wagner*, 180 *N.J.Super.* 564, 567, 435 *A.*2d 1190 (App.Div.1981), the court stated:

> There are times, even in the absence of prejudice to a defendant, when it is essential to insure future observance of a prescribed practice safeguard or the vindication of a fundamental principle that courts should not hesitate to reverse
>
> . . . .
>
> . . . . When the integrity of the process is at stake, prejudice is not a precondition to successfully asserting impairment of the fundamental right of proper jury selection.
>
> [*Ibid.* (citations omitted).]

*State v. Williams, supra,* 93 *N.J.* at 60–61, 459 *A.*2d 641, cited *Wagner* approvingly for the proposition that a defendant's right to trial by a fair and "impartial jury is of exceptional significance." This is a case in which the "circumstances . . . are so likely to prejudice the accused that the cost of litigating their effect . . . is unjustified." *United States v. Cronic,* 466 *U.S.* 648, 658, 104 *S.Ct.*

2039, 2046, 80 *L.Ed.*2d 657, 667 (1984). When the integrity of the jury selection process has been compromised to the extent involved here, prejudice to a defendant will be presumed. When the judge left G.B. in the jury box to punish her, defendant's constitutional right to a fair and impartial jury was compromised.

■ Finally, the record is unclear whether the judge adjudicated G.B. for contempt under *Rule* 1:10-1. Any finding of contempt must be vacated because the judge should have recognized G.B. when she sought to be heard before the second panel was brought to the courtroom. No attempt was made to ascertain why G.B. had not tried to inform the court earlier concerning her prejudice and bias. Without that record, a finding of contempt would have been improper. *See R.* 1:10-1.

## III.

The judgment of the Appellate Division is reversed and the matter is remanded to the Law Division for a new trial.

*For reversing and remanding*—Chief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA, ZAZZALI, and ALBIN—7.

*Opposed*—None.