877 A.2d 313 (2005)
379 N.J. Super. 179
STATE of New Jersey, Plaintiff-Respondent,
v.
Joseph W. TINNES, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued June 2, 2005.
Decided July 12, 2005.
*315 Michael J. Rogers, Somerville, argued the cause for appellant (McDonald & Rogers, attorneys; Mr. Rogers, of counsel and on the brief).
James L. McConnell, Somerville, argued the cause for respondent (Wayne J. Forrest, Somerset County Prosecutor; Mr. McConnell, of counsel and on the brief).
Before Judges WEFING, PAYNE and C.S. FISHER.
The opinion of the court was delivered by
FISHER, J.A.D.
In this appeal, we conclude that defendant was deprived of a fair trial because his counsel was required to utilize eight of his ten peremptory challenges prior to the trial judge determining whether any of the seated prospective jurors had a hardship that would have prevented them from serving. Once that question was posed, five of the fourteen satisfactory jurors were excused for hardship reasons, and defendant quickly exhausted his few remaining peremptory challenges during the process of selecting their replacements. Because the trial judge's bifurcated voir dire damaged the integrity of the jury selection process in this case, we reverse and remand for a new trial.

I
The grand jury returned Indictment No. 02-12-00850,[1] charging defendant with one count of second-degree possession of a weapon for an unlawful purpose, in violation of N.J.S.A. 2C:39-4(a), one count of third-degree unlawful possession of a handgun, in violation of N.J.S.A. 2C:39-5(b), one count of third-degree criminal mischief, in violation of N.J.S.A. 2C:17-3(a), and two counts of fourth-degree criminal mischief, in violation of N.J.S.A. 2C:17-3(a). A trial took place on September 29 and 30, and October 1, 7, 8 and 9, 2003. At its conclusion, the jury found defendant guilty of the first four counts of the indictment. The fifth count was dismissed by the trial judge for lack of evidence. The trial judge also denied defendant's motion that sought a judgment of acquittal or a new trial. Defendant was sentenced to a term of imprisonment of seven years, with a three-year period of parole ineligibility. Mandatory fees and assessments were also imposed.
Defendant appealed, asserting the following arguments:
I. THE JURY SELECTION PROCEDURES EMPLOYED BY THE TRIAL COURT DENIED DEFENDANT A FAIR TRIAL.
II. THE STATE'S BALLISTICS EXPERT SHOULD NOT HAVE BEEN PERMITTED TO RENDER AN OPINION THAT A PROJECTILE FOUND AT THE RESTAURANT WAS FIRED FROM THE REVOLVER FOUND NEAR DEFENDANT'S PLACE OF BUSINESS BECAUSE HE UTILIZED NO STANDARDS IN RENDERING HIS OPINION.
III. THE TRIAL COURT IMPROPERLY PERMITTED THE INTRODUCTION *316 OF CHARACTER EVIDENCE OF THE ACCUSED; ADDITIONALLY, THE TRIAL COURT SHOULD HAVE PERMITTED THE INTRODUCTION OF EXTRINSIC EVIDENCE TO IMPEACH THE CREDIBILITY OF MEGAN PETROVICZ [SIC] WITHOUT REBUTTAL BY THE STATE.
IV. THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.
V. THE INDICTMENT SHOULD HAVE BEEN DISMISSED BECAUSE THE STATE DID NOT PRESENT EXCULPATORY BALLISTICS EVIDENCE TO THE GRAND JURY.
Because we agree that the trial judge erroneously conducted a bifurcated voir dire whereby he did not advise the jury panel of the trial schedule or ask whether that schedule would constitute a hardship on any of them until after defendant had used eight of his ten peremptory challenges, we conclude that defendant was deprived of a fair trial, and we reverse and remand for a new trial. As a result, we need not consider or decide the issues raised by defendant in Points II, III, IV and V.

II
An accused is constitutionally guaranteed the right to trial by an impartial jury by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, paragraph 10 of our State Constitution. State v. Fortin, 178 N.J. 540, 575, 843 A.2d 974 (2004); State v. Williams, 113 N.J. 393, 409, 550 A.2d 1172 (1988) (Williams II). The jury selection procedures adopted in this State, by statute and rule, are designed to pursue the goal of producing a jury in each case that is "as nearly impartial as the lot of humanity will admit." State v. Williams, 93 N.J. 39, 60, 459 A.2d 641 (1983) (Williams I).
Jury selection is "an integral part of the process to which every criminal defendant is entitled." State v. Singletary, 80 N.J. 55, 62, 402 A.2d 203 (1979); see also State v. W.A., 184 N.J. 45, 53-54, 875 A.2d 882 (2005); Williams II, 113 N.J. at 409, 550 A.2d 1172; State v. Brunson, 101 N.J. 132, 138, 501 A.2d 145 (1985). The trial judge plays a critical "gatekeeping" role in this regard, State v. Tyler, 176 N.J. 171, 181, 821 A.2d 1139 (2003), which has been described as vesting the trial judge with a "high responsibility," ibid., that includes taking "all appropriate measures to ensure the fair and proper administration of a criminal trial," Williams I, supra, 93 N.J. at 62, 459 A.2d 641.
One vital aspect of the trial judge's gatekeeping role is the obligation to conduct "a thorough voir dire," State v. Fortin, supra, 178 N.J. at 575, 843 A.2d 974, that "probe[s] the minds of the prospective jurors to ascertain whether they hold biases that would interfere with their ability to decide the case fairly and impartially," State v. Erazo, 126 N.J. 112, 129, 594 A.2d 232 (1991). While it has been said that the trial judge possesses "broad discretionary powers in conducting voir dire [that] `will ordinarily not be disturbed on appeal,'" our Supreme Court has also indicated that it will not "hesitate[] to correct mistakes that undermine the very foundation of a fair trialthe selection of an impartial jury." State v. Fortin, supra, 178 N.J. at 575, 843 A.2d 974 (quoting Williams II, supra, 113 N.J. at 410, 550 A.2d 1172).
The proper selection of a jury that is as fair and impartial as our procedures permit starts with the random selection of citizens, N.J.S.A. 2B:23-2, whose knowledge and opinions are then probed through voir dire, N.J.S.A. 2B:23-10; R. 1:8-3. The jury's membership is further refined through the use of challenges for cause, as permitted by N.J.S.A. 2B:23-11; R. 1:8-3(b), *317 and peremptory challenges, as permitted by N.J.S.A. 2B:23-13; R. 1:8-3(d). Voir dire is integral to the process of exercising the right to challenge, and must be designed to elicit responses from potential jurors from which the parties may intelligently exercise their rights to challenge jurors either for cause or peremptorily. State v. Dishon, 297 N.J.Super. 254, 271-73, 687 A.2d 1074 (App.Div.), certif. denied, 149 N.J. 144, 693 A.2d 112 (1997).
Challenges for cause are based upon proof of legally cognizable grounds of a potential juror's partiality. Peremptory challenges, on the other hand, are something less precisesomething the essence of which represents an "undefinable frisson either of comfort or unease that passes from one person to another." State v. W.A., supra, 184 N.J. at 55, 875 A.2d 882; see also Pointer v. United States, 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208, 214 (1894); State v. Dishon, supra, 297 N.J.Super. at 272, 687 A.2d 1074. Here, as more fully described later in this opinion, the parties were required to exercise peremptory challenges before they had learned whether the seated jurors would be able to remain for the duration of the trial without that service causing an undue hardship.
While it is true that the loss of a peremptory challenge has never been viewed either in the federal system or in this State as a constitutional deprivation, the right to use peremptory challenges is nevertheless a "substantial right," State v. Singletary, supra, 80 N.J. at 62, 402 A.2d 203; see also State v. W.A., supra, 184 N.J. at 55-56, 875 A.2d 882, with "historic roots," State v. Brunson, supra, 101 N.J. at 136, 501 A.2d 145.[2] As explained by the Court in State v. DiFrisco, 137 N.J. 434, 468, 645 A.2d 734 (1994) (quoting State v. Brunson, supra, 101 N.J. at 137-38, 501 A.2d 145, and Swain v. Alabama, 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759, 772 (1965)), cert. denied, sub nom., DiFrisco v. New Jersey, 516 U.S. 1129, 116 S.Ct. 949, 133 L.Ed.2d 873 (1996), the peremptory challenge is "a creature of statute designed `to eliminate extremes of partiality on both sides, [and] to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them and not otherwise.'" See also J.E.B. v. Alabama, 511 U.S. 127, 137 n. 7, 114 S.Ct. 1419, 1426 n. 7, 128 L.Ed.2d 89, 102 n. 7 (1994) ("Although peremptory challenges are valuable tools in jury trials, they `are not constitutionally protected fundamental rights; rather they are but one state-created means to the constitutional end of an impartial jury and a fair trial.'").
Having closely reviewed what occurred during the jury selection in this matter, hereafter expounded in detail, we conclude that the trial judge's voir dire was inadequate because it was bifurcatedthat is, the judge failed to inquire as to the panel's ability to sit for a trial that would extend into the following week until after calling upon counsel for the exercise of their peremptory challenges, thus significantly reducing defendant's statutory and rule-based allotment of those challenges.

III

A
At the commencement of the trial, the trial judge discussed with counsel the *318 content of the voir dire. Toward the end of that hearing, the following occurred:
THE COURT: And ... we're ready to send for the jury, counsel?
[DEFENSE COUNSEL]: Yes, sir.
[PROSECUTOR]: That's fine, Judge. I think maybe it's my fault we went off on a tangent when we got to the end of when how long you're going to tell them the trial is.
THE COURT: It looks like it's going into next week and that's all I can tell them.

[THE PROSECUTOR]: I don't see how that's avoidable.
THE COURT: And we'll see who has problems coming back next week. Send for the jury panel.
[Emphasis added.]
Once the jury panel arrived, the trial judge read the indictment to them, identified the attorneys, the defendant, and the anticipated witnesses, and gave the usual instructions. Jury selection commenced with the seating of fourteen members of the panel in the box.
During the voir dire that followed, the trial judge agreed that a question to be posed to potential jurorsconcerning their feelings about marital infidelitywould be asked at sidebar. Until that point, the potential jurors had not been advised of the length of the trial nor was inquiry made as to their availability for that length of time. During the sidebar examination about marital infidelity, a few jurors were told about the length of the trial but only when the juror specifically asked. For example, one potential juror expressed concerns about taking time off from work:
JUROR: I just lost my father a month ago and he was very sick for a long time and I took care of him. My job changed, I just took months off, I just went back. My job changed as of last week. I'm an Executor of his will, so I have a ton of stuff going on and I'm really not holding straight.
THE COURT: [Y]ou think this is going to ... [a]ffect your job?
JUROR: No, it's just an array of everything that's going on in my life right now. I'm overwhelmed, you know, it was a long illness.
THE COURT: It looks like we're going to try this case today, tomorrow and Wednesday, Thursday and Friday you have on your own. Monday you'll have on your own, and [we will] bring the case back on Tuesday. Given the burdens you have, given the scheduling, do you think it's something you can manage knowing that?
JUROR: I'll try, I'll try.
Eventually, this potential juror was excused. But the fact that this discussion occurred did not prompt the trial judge to then advise the entire panel of the trial schedule or question whether the length of the trial would cause a hardship, as his pre-selection comments suggested would occur.
Jury selection was not completed the first day, and resumed the next morning. After concluding a sidebar discussion with another potential juror, but while counsel remained at sidebar, the trial judge and counsel again discussed the length of the trial. The prosecutor reminded the judge that the trial would extend into the next week, but that it should be completed either on the following Tuesday or possibly Wednesday:
THE COURT: ... I didn't get a chance to ask [counsel] about the question with the length of time going into next week. I think I have to leave that at Tuesday, because of your appointment.
[THE PROSECUTOR]: You have to take Tuesday. I'm suggesting it may *319 even be Wednesday. Not because of my case, but if there's any defense case at all.
THE COURT: Oh, I'm going to indicate that it's going to go into next week.

[THE PROSECUTOR]: Okay.
[DEFENSE COUNSEL]: I think you need to just tell them that we're going to be off on Thursday, Friday, and Monday, so they know, okay?
THE COURT: Yeah, anything else? We can continue the selection. Defense ready?
[DEFENSE COUNSEL]: Yes.
(Whereupon side bar concluded.)
[Emphasis added.]
Even though the trial judge had never advised the panel about the length of the trial or asked if the schedule would cause a hardship, after the conclusion of the side bar referred to directly above, in which the judge indicated that he would so inform the jury, the judge instead stated in open court only that the voir dire was finished as to "basic information." With that, the trial judge turned to the prosecutor, who excused juror number five.
The person who replaced juror number five was then asked a series of questions, but again the trial judge did not advise of the trial schedule or inquire as to her ability to be present at those times. Defense counsel then excused another juror, and so the matter proceeded.
After a number of peremptory challenges were used by both sides, the trial judge again mentionedafter the conclusion of a sidebar conference with a potential juror but while counsel remained at sidebarthat
I really haven't asked the [hardship] question. I told them about the question, but the length of the trial, that might generate some other side bar.
This discussion then concluded, but the judge yet again did not address the trial schedule in open court; instead, he proceeded to examine a new potential juror.
Not long after, another potential juror raised a concern at side bar about the financial impact she would endure if required to serve. The judge advised her of the trial schedule and, with a few more questions, eventually excused the juror for hardship reasons. Again, following this, the trial schedule still was not discussed in open court with the other members of the panel.
The next potential juror seated in the box was eventually brought to sidebar. During the voir dire that occurred there, the potential juror expressed the need to be available to care for her sick mother. The judge then advised of the trial schedule and eventually determined to excuse the juror, making the following comments at sidebar to counsel:
THE COURT: I'll excuse her. Of course we haven't brought up the time factor, because I'm going to lose a number [of jurors] when I bring that up. But we'll excuse her and then proceed.
[Emphasis added.]
This stage of the process was completed without the hardship question ever having been put to the entire panel.

B
Once both counsel indicated that the jury was satisfactorythe State had used three and the defense had used eight peremptory challengesthe trial judge asked those in the box whether any of them had physical problems that would make their service on the jury difficult. Receiving no response, the judge made the following announcement to the jury:
[I]t appears that this case is going to go into next week. That's not your favorite thing to hear today, but it appears that *320 today, Tuesday, and Wednesday, we'll be involved in listening to the testimony in the case and then the case is going to jump until next Tuesday. So Thursday, Friday of this week, and Monday of next week, you have to yourself. Go to work or whatever you want to tell your boss, do that. And pick the case up again next Tuesday.
I know that that is never good news for the jury.
....
Having said all this, are there any severe hardship problems I should know about in your jury service? I know it's a hardship for everybody. We'll take you over at side bar one at a time.
The first juror to indicate a problem was brought to side bar and indicated that she anticipated difficulty in paying her rent if she were forced to be out of work during the trial. In discussing, out of her presence, whether this was sufficiently onerous to justify excusing her, and in response to defense counsel's indication that she "initially ... would have been excused," the judge indicated that "[s]o everybody understands, this is going to snow ball," and excused the juror.
A second juror referred to a business trip on the following Tuesday and asked to be excused. In the discussion that followed, defense counsel stated:
My problem is, Judge, I now have exercised, I think seven [actually, eight] of ten peremptory challenges.... I've never encountered this in my career, where we're having the hardships after the lawyers have [announced satisfaction with the jury], and I didn't know that would happen. But we're going to start getting back into jury selection. In essence, I'm going to need more peremptory challenges.
The judge deferred further discussion on this point and proceeded to excuse the juror. After another juror was excused for hardship reasons, defense counsel observed, "I don't know what to do at this point, you know, we're spinning out of control with this jury now, and I guess there's nothing we can do to stop it."
Once all the claimed hardships were heard and dealt with, five out of the fourteen jurors that the parties were satisfied with had been excused. Three others claimed hardships but were not excused.
There followed a brief discussion about the number of defendant's remaining peremptory challenges. Defense counsel thought he had used only seven but the clerk indicated he had used eight:
[DEFENSE COUNSEL]: I stand corrected. In my haze, maybe I didn't mark one down.
THE COURT: I recall that there was a juror that wanted to be excused and you asked she be excused and I indicated that you could exercise your challenge. You did exercise a challenge, but given the sequence, I'm going to add one to your selection, so
[DEFENSE COUNSEL]: Okay, I appreciate that. I don't think that's sufficient, but I do appreciate that and I'm not quarreling with the Court. But from my point of view, the problem is... we ... ended up creating an entirely different jury....
Notwithstanding defense counsel's expression of concerns over the fact that he used eight peremptory challenges and ultimately declared that the jury was satisfactory only to have five out of those fourteen jurors excused for hardships, the trial judge continued with the selection process and called upon the parties to again begin using, if they wished, whatever peremptory challenges remained.
*321 After the prosecutor used a peremptory challenge to excuse a male juror, defense counsel sought a mistrial:
What has happened here ... we've dramatically changed the character of the jury after both sides have said [it] was satisfactory.... And when I said satisfactory, there was a certain number of men, I think six or seven men on the jury.... [T]here's now twelve women and two men on the jury. And the jury selection process, from my posture, has become fatally defective because of the Court asking the hardship question after both sides had said satisfactory.

I'm now left with ... two challenges, there's a number of jurors that have been replacing the jurors that the Court excused for hardship reasons. And the entire character of what I and my client were satisfied with has now changed ... and I think the only way to make it right is to start over.

[Emphasis added.]
The trial judge also acknowledged that "gender-wise" there was "a substantial change in the jury panel" after hardship excuses were considered and granted, but nevertheless denied defendant's motion.
Following that, defense counsel ultimately used his remaining peremptory challenges. The prosecutor thereafter indicated that the jury was satisfactory, and defendant had no other choice but to accept the consequences, since he had no other peremptory challenges left to use. The trial proceeded to its ultimate conclusion.

C
We agree with defendant that the process adopted by the trial judge in overseeing the selection of the jury was flawed. Even though the voir dire was deficient in only one respect, that one erroneous omission was highly critical. The judge knowing that the trial would not be completed within the jurors' week of service but would also require one or possibly two days the following week, and knowing that many jurors would claim, rightfully, that service for that particular length of time would cause a hardshipdeclined to advise the panel of the trial schedule and declined to inquire whether that schedule would impose hardships until late in the selection process. The failure to pose these questions prior to the exercise of peremptory challenges was erroneous. Indeed, we observe in this regard that the May 16, 2005 Report of the Special Committee on Peremptory Challenges and Jury Voir Dire indicates that the standard jury voir dire for a criminal matter of such length should include the following simple question:
This trial is expected to last for _____ to _____ weeks. Is there anything about the length or scheduling of the trial that would interfere with your ability to serve?
See also N.J.S.A. 2B:23-10 ("In the discretion of the court," examination of potential jurors "shall be permitted in order to disclose whether or not the juror is qualified, impartial and without interest in the result of the action.").
When the judge ultimately posed this question to the entire panelafter both sides had utilized peremptory challenges and declared the jury satisfactoryeight of the fourteen jurors claimed a hardship and five were actually excused. The very fact that this omitted question provoked that response from such a large percentage of the jury panel demonstrates the question's importance and the deficient nature of the judge's bifurcated voir dire. The only question left to determine here is whether this error was harmless or requires reversal.

*322 IV
A number of our Supreme Court's decisions over the past few decades set forth the parameters within which the loss of a single peremptory challenge requires reversal. To understand the expanse of these parameters, close examination of the Court's decisions is warranted.
In State v. Jackson, 43 N.J. 148, 203 A.2d 1 (1964), cert. denied, sub nom., Ravenell v. New Jersey, 379 U.S. 982, 85 S.Ct. 690, 13 L.Ed.2d 572 (1965), defendant was charged with murder. After jury selection was completed and the jury sworn, the trial judge had second thoughts about denying a challenge for cause of a juror who stated that he was related to a captain of the police department that investigated the matter. This juror was replaced by another who stated that he knew a number of members of the police force, including a detective who was the State's principal witness.[3] Defense counsel, who no longer possessed any peremptory challenges, moved to have this new juror removed for cause. The trial judge denied that request and the juror was allowed to deliberate and render a verdict along with the other jurors. Concluding that this juror should have been excused for cause, the Court reversed and remanded for a new trial. Justice Jacobs stated for the unanimous Court:
Surely the defendants were amply justified in refusing to accept [the juror's statement that his friendship with the State's witness would not bear upon his rendering a fair and impartial verdict] and when their objection to his serving was voiced in timely fashion it should have been honored, if for no other reason than to insure their confidence in the basic fairness of the trial. In any sound judicial system it is essential not only that justice be done but also that it appear to be done.
[Id. at 160-61, 203 A.2d 1.]
In State v. Deatore, 70 N.J. 100, 358 A.2d 163 (1976), defendant was charged with the armed robbery of a store proprietor and customer. A juror indicated during voir dire that she knew, both personally and in business, the alleged customer-victim. Id. at 104, 358 A.2d 163. The trial judge denied defense counsel's motion to have the juror dismissed for cause, prompting defense counsel to excuse this juror with a peremptory challenge. Later, another potential juror indicated having two relatives who worked as correction officers. Defense counsel suggested potential bias in this juror and requested his removal for cause. The judge refused and, because defense counsel had exhausted all his peremptory challenges (the judge also denied defendant's request for an additional peremptory challenge), the challenged juror remained on the jury. The Supreme Court affirmed our reversal of the conviction, concluding that the judge erred in failing to conduct a more searching voir dire of the first juror. Id. at 105-06, 358 A.2d 163. The members of the Court unanimously agreed with that part of Chief Justice Hughes's majority opinion that expressed the view that the Court "had no doubt that the trial judge committed fundamental error in its [sic] refusal to conduct or permit further examination" of the juror who knew the customer-victim. Id. at 105, 358 A.2d 163. By so holding, it *323 seems clear that the Court viewed the unnecessary exercise of a peremptory challenge to remove a juror who should have been excused for cause, resulting in the eventual expenditure of all peremptory challenges, as reversible error.
In State v. Singletary, supra, 80 N.J. 55, 402 A.2d 203, a potential juror (Sheeran) indicated being a victim of a similar bank robbery as that for which defendant was charged. Because Sheeran expressed that he could remain fair and impartial despite that experience, the trial judge refused to excuse him for cause. Defense counsel used his penultimate peremptory challenge to excuse Sheeran and later used his last. Defense counsel then again asserted his objection to having to use one of his peremptory challenges on Sheeran claiming that, as a result, he had been erroneously required to exhaust his entire complement of peremptory challenges. Id. at 60-61, 402 A.2d 203.
A sharply-divided Court reinstated defendant's conviction, deferring to the trial judge's determination of Sheeran's "sincerity and credibility." Id. at 64, 402 A.2d 203. Even though the majority also acknowledged that "it might well have been the wiser course" to excuse Sheeran, the Court concluded that the failure to excuse him "was not so clearly an abuse of discretion as to necessitate reversal on this ground alone." Ibid.
Three members of the Court dissented from this view in two separate opinions one authored by Justice Clifford, which was joined by Chief Justice Hughes, and the other by Justice Handler. Both these dissenting opinions focused on the deprivation of due process caused by the interference with defendant's right to the number of peremptory challenges permitted by statute and rule. As Justice Clifford put it:
The trial court's ruling, apparently made in reliance upon Sheeran's stated belief that he could nevertheless remain impartial, required defense counsel to use one of his two remaining peremptory challenges to excuse this venireman. Shortly thereafter defendant exhausted his allotment of twenty peremptory challenges before the jury was empanelled. His compelled use of a peremptory challenge to achieve what should have followed from his challenge for cause deprived him of one of his allotted peremptories. He was entitled to twenty and was in effect accorded but nineteen. That, in a word, is the rub.
[Id. at 68-69, 402 A.2d 203 (citations omitted).]
As a result of this diminution in the number of defendant's peremptory challenges, Justice Clifford explained why he would have affirmed our reversal of the conviction:
There is no New Jersey case which supplies the answer [to how to consider whether defendant was prejudiced]. It lies, I think, for the most part in the importance one attaches to the attainment of a fair and impartial jury and to the process available to achieve that end. I tend to view that process (without for a moment suggesting that any member of this Court feels otherwise) as considerably more than a procedural formality. The right to be tried by a fair and impartial jury is a "fundamental" one to be "jealously guarded." Our rules are carefully, albeit imperfectly, designed to assure the empanelling of a jury that to the greatest extent possible will reach its verdict on the evidence with absolute fairness and complete impartiality. Hence in a criminal case such as this one defendant is afforded twenty opportunities to excuse any venireman peremptorily for a good reason, a bad reason, or no *324 reason at all.... Any diminution of or infringement upon that legislatively granted opportunity deprives defendant of as fair a trial as our rules permit. Defendant's argument here, with which I agree, is that his claim of error derives from his due process guarantees and from our standards of fair trial, whereas his entitlement to relief springs from the legislative grant of twenty peremptory challenges and his right thereto, which he was denied.
[Id. at 71, 402 A.2d 203 (quoting Wright v. Bernstein, 23 N.J. 284, 295, 129 A.2d 19 (1957)).]
Justice Handler indicated his belief, also joined by the Chief Justice and Justice Clifford, that it was not only the erroneous deprivation of one of twenty peremptory challenges that generated reversible error, but also the fact that "coming as it did at the tail-end of the jury selection procedure," the failure to excuse Sheeran for cause "left defendant with almost no flexibility in reassessing jurors previously summoned from the standpoint of their comparative eligibility to remain on the panel or to be replaced from the pool of prospective jurors. Defendant was unfairly forced to expend a peremptory challenge and excuse Sheeran and almost immediately thereafter dissipated his last challenge, exhausting all options." Id. at 83, 402 A.2d 203.
A comparison of the separate Singletary opinions reveals that a slim majority of the Court had determined that a loss of a single peremptory challenge (out of twenty) was insufficient to alone warrant reversal when the juror in question was eventually excused from the jury.
In State v. Bey, 112 N.J. 123, 154, 548 A.2d 887 (1988), the Court determined that a defendant's expenditure of a peremptory challenge on a juror who should have been excused for cause was harmless because defendant never used his full allotment of peremptory challenges. Justice Handler disagreed with that holding, amplifying upon the view he expressed in his dissent in State v. Singletary, supra, in the following way:
While the exhaustion of peremptory challenges is without doubt indicative of prejudice, it simply does not follow, as the majority assumes, that the failure to exhaust peremptory challenges automatically precludes a claim of prejudice. Indeed, given the nature of the peremptory challenge ..., the issue of whether the erroneous refusal to excuse a juror is harmless cannot depend exclusively on whether a defendant has exhausted his peremptory challenges. [E]very time a peremptory challenge is "wasted" on a juror who should have been excused for cause, the calculus is altered with respect to the rest of the panel and the defendant's right to his full complement of challenges is abridged. As the Supreme Court of Missouri has explained, in an analogous context, "`Purity of the right to be tried by an impartial jury is so zealously guarded that an accused may covet his peremptory challenges and "spend" them as he alone sees fit.... [I]f an accused is not presented with a full panel of jurors objectively demonstrated as qualified before he exercises his peremptory challenges, his given number of peremptory challenges is proportionately reduced and his right to "spend" them as he alone sees fit is accordingly impinged.'" State v. Morrison, 557 S.W.2d 445, 446 (Mo.1977) (quoting State v. Thompson, 541 S.W.2d 16, 17 (Mo.App.1976)).
[112 N.J. at 201, 548 A.2d 887.]
Justice Clifford joined in this view.
In Williams II, the Court declined to determine whether "the loss of a peremptory challenge ... where all peremptories *325 were ultimately exhausted would, by itself, warrant reversal," finding instead that "whatever prejudice may be attributed to that loss was compounded by a voir dire so inadequate as to leave in doubt the ultimate impartiality of the jury." 113 N.J. at 445, 550 A.2d 1172. Justice Handler concurred in the Court's judgment, but wrote separately to assert that the Court should have "conclude[d] that an erroneous failure to dismiss a juror for cause, leading to an expenditure of one of defendant's peremptory challenges and the ultimate exhaustion of defendant's allotment of challenges, warrants reversal." Id. at 466, 550 A.2d 1172.
To summarize, by the time the Court decided State v. DiFrisco, supra, 137 N.J. 434, 645 A.2d 734, it had determined that the loss of a single peremptory challenge where the defendant had not exhausted all his peremptory challenges was harmless, State v. Bey, supra, 112 N.J. at 154, 548 A.2d 887, but had twice chosen not to determine whether the loss of a single peremptory challenge when the defendant had exhausted all his peremptory challenges was reversible error, Williams II, supra, 113 N.J. at 445, 550 A.2d 1172; State v. Bey, supra, 112 N.J. at 154-55, 548 A.2d 887; but cf. State v. Deatore, supra, 70 N.J. at 104-05, 358 A.2d 163.
The Court determined in State v. DiFrisco to resolve whether the erroneous deprivation of a single peremptory challenge, when a defendant had exhausted the full allotment of peremptory challenges, requires reversal. The parties did not raise the issue; instead, the Court raised it on its own. 137 N.J. at 466, 645 A.2d 734. The four-member majority of the Court concluded that in order to obtain reversal for "the forced expenditure of a peremptory challenge," a defendant must demonstrate that "a juror who was partial sat as a result of the defendant's exhaustion of peremptories," id. at 470, 645 A.2d 734, and announced the following three-part test for the adjudication of such contentions:
To prove such error a defendant must show (1) that the trial court erred by failing to remove a juror for cause; (2) that the juror in question was eliminated by the exercise of defendant's peremptory challenge and that defendant exhausted his remaining challenges; and (3) that at least one of the remaining jurors that sat on the jury was a partial juror.
[Id. at 471, 645 A.2d 734.]
Describing the majority's rule as "overly formalistic," Justice Handler dissented. He asserted that the majority's three-part test had "reduce[d] the role of peremptory challenges to that of a mere supplement to the trial court's responsibility to ensure an impartial jury," and transformed the right to use "peremptory challenges into a `safety net' for imprudent trial court decisions on juror exclusion." Id. at 434, 645 A.2d 734. Two other justices also dissented from the majority's affirmance of the conviction and death sentence, but joined in only an unrelated portion of Justice Handler's dissent.
This Term, the Court decided State v. W.A., supra, holding that a criminal defendant has the right to attend and participate in the jury selection process because "the defendant himself ... plays the critical role in exercising the peremptory challenge." 184 N.J. at 54, 875 A.2d 882. This holding would appear to suggest that State v. DiFrisco, through its adoption of a three-part test for detecting prejudice, had not turned the right to exercise peremptory challenges into what Justice Handler lamentingly referred to as a "`safety net' for imprudent trial court decisions," 137 N.J. at 434, 645 A.2d 734, but instead indicated that there are other circumstances *326 beyond that specifically dealt with in State v. DiFrisco, and beyond the loss of a single peremptory challenge, that might generate a reasoned sense that prejudice should be presumed upon a trial judge's departure from the known and accepted procedures for selecting a jury in our judicial system.

V
Against this backdrop, we examine whether the trial judge's error requires reversal by attempting to quantify the consequence of his bifurcated voir dire. As observed, defendant used eight peremptory challenges before advising the trial judge that the jury was satisfactory. Only then did the judge resume his voir dire to ascertain whether any juror would suffer a hardship if required to serve into the following week. When that question was finally posed, eight of the fourteen jurors (57%) claimed a hardship and five of the fourteen (nearly 36%) were excused for hardship reasons. If we were to attempt to mathematically estimate the quantitative effect of the bifurcated voir dire on defendant's use of peremptory challenges, we could conclude that 36% of the jurors excused by defendant through the use of his first eight peremptory challenges two, possibly three jurors[4]  would also have been excused by the judge for hardship reasons and, thus, we could assume that when the selection process continued after both sides had announced satisfaction with the jury, that defendant would still have had four or possibly five more peremptory challenges, instead of just two.[5] In so analyzing the problem, it would appear that the consequences of the bifurcated voir dire were more extensive than the situations presented in the line of Supreme Court decisions, discussed earlier, that examined the impact of the needless use of one peremptory challenge.
This statistical estimate not only propels our conclusion that defendant was deprived of a significant number of his statutory and rule-based allotment of peremptory challenges, and was deprived of the right to knowingly use eight of them because the trial judge asked the hardship question after the parties' use of their peremptory challenges. We also conclude that the failure to pose the hardship question prior to the exercising of the parties' peremptory challenges results in reversible error (at least when it ultimately leads to the complete exhaustion of a defendant's peremptory challenges). In this light, the case at hand bears similarities to our decision in State v. Dishon, supra, 297 N.J.Super. 254, 687 A.2d 1074.
In State v. Dishon, the trial judge's voir dire included, in part, advising the panel that the case "involved homosexuality and an attitude towards homosexuals," and asking whether that would prevent them from rendering a fair and impartial verdict. Id. at 265-66, 687 A.2d 1074. The parties were thereafter called upon to exercise their peremptory challenges; defendant exhausted all his twenty peremptory *327 challenges at this stage. The judge "then called each of the fourteen jurors into chambers individually" and provided more detail as to the evidence relating to homosexuality. Id. at 266-67, 687 A.2d 1074. The jurors were asked an array of questions in this area and ultimately asked whether they could "give defendant a fair trial if it were revealed that he was homosexual or bisexual." Id. at 267, 687 A.2d 1074. The following resulted:
One of the jurors, juror number four, informed the judge that he was "not sympathetic at all with homosexuality," but his view would not affect his decision. Another juror, number nine, who had previously informed the court that he was a homosexual, expressed the opinion that there was no relationship between an individual's sexual preference and his or her veracity. He also stated that if the evidence were to reveal that defendant was either a homosexual or bisexual, but had made disparaging remarks about homosexuals, he could put this aside and give defendant a fair trial based on the evidence.
None of the jurors were challenged as a result of what transpired during the voir dire in chambers. Jurors number nine and four both sat as deliberating jurors.
[Id. at 267, 687 A.2d 1074.].
On appeal, defendant argued that he was deprived of the right to be present during the in camera voir dire. In speaking for the court, Judge Havey focused the dispute on the fact that the conducting of such a bifurcated voir dire constituted a "fundamental error":
The State reasons that defendant can show no prejudice because he had already exercised all of his peremptory challenges before the in camera voir dire took place. But this assertion of "harmlessness" is bottomed on a second, fundamental error committed by the trial judge not raised by defendant, namely conducting the in camera questioning of the jurors after defendant's peremptory challenges had been exhausted. The procedure distorted the jury selection process and impaired defendant's right to exercise knowingly his peremptory challenges. This is so because defense counsel exercised all of defendant's challenges before the jurors' possible bias regarding homosexuality was fully explored.
....
Since the information elicited during voir dire is for the purpose of determining whether to interpose a peremptory challenge, the voir dire must, of necessity, precede the exercise of peremptory challenges.
....
The exercise of peremptory challenges presupposes a knowing participation by the accused. Here, during the general voir dire, when defendant was present and still had peremptory challenges, the single question about homosexuality was nonspecific; the jurors were simply told that there may be a homosexuality theme to the proofs presented by the State. The trial judge then recognized, and properly so, that extensive questioning of each juror as to his or her potential bias because of the homosexuality issue was necessary. The fatal error was that the judge chose not only to conduct this voir dire outside of defendant's presence, but did so after defendant had exercised all his peremptory challenges. This procedure had the effect of nullifying defendant's "substantial right" to a full and probing voir dire in his presence, and to exercise all of his peremptory challenges predicated on his "feel" of each juror's reaction to the questioning.

*328 [Id. at 270, 271, 272-73, 687 A.2d 1074.]
The error complained of herethat defendant was required to utilize peremptory challenges before voir dire was complete is on the same plane as the error found in State v. Dishon. It requires reversal, as in State v. Dishon, because it is the type of error that infects the integrity of the jury selection process.
We further note that when an error of this particular sort occurs, the extent to which a defendant has been prejudiced cannot be quantified in the manner required by the fact-specific test enunciated in State v. DiFrisco, because the nature of the error precludes the type of evaluation anticipated in the dissimilar circumstances discussed in it. Because we cannot precisely quantify the effect of the bifurcated voir dire except to conclude that it undoubtedly significantly reduced defendant's allotment of peremptory challenges, we find that an error of this nature is not the type that requires proof of actual prejudice, but, instead, presents a situation to which a presumption of prejudice attaches.
For example, while factually dissimilar, State v. Tyler, supra, 176 N.J. 171, 821 A.2d 1139, illuminates the manner in which the trial judge's error here compels reversal. In Tyler, during the selection process, the judge asked whether there was "any reason best known to you now that you've had an opportunity to search your own conscience as to why you could not or should not serve as a juror in this case?" 176 N.J. at 175, 821 A.2d 1139. No potential juror responded. After the use of some peremptory challenges, which exhausted the panel in the courtroom at the start of the process, and while the court awaited the arrival of another panel, one of the jurors seated in the box, identified as G.B., raised her hand and asked if she could speak to the judge at sidebar. Id. at 176, 821 A.2d 1139. The judge refused. Ibid. After the parties exercised other peremptory challenges, counsel pronounced the jury (which included G.B.) to be satisfactory, and the jury was sworn. Ibid. Before opening statements, G.B. and another juror asked to speak to the judge.
Outside the presence of the jury, the judge was told by G.B., who worked in a law office, that she felt she should not remain on the jury, stating: "I'm dealing with crimes all day long and I can't have an unbiased opinion of the whole case." Id. at 177, 821 A.2d 1139. This occurred toward the end of the day, and the judge expressed dissatisfaction with the fact that G.B. did not previously raise her alleged biased view. Defense counsel objected to G.B. remaining on the jury and the judge responded that defense counsel was correct, and that G.B. would not remain as a deliberating juror, but that G.B. would perhaps be required to remain as a form of sanction for her disingenuous approach to the judge's voir dire and her "desperate attempt to get out of the jury [by] trying to find the magic words that would release her from jury service." Id. at 178, 821 A.2d 1139. The judge indicated that the matter would be considered and addressed again the following morning.
The next morning, these circumstances were again placed on the record and the judge again acknowledged that G.B. would not be permitted to deliberate but would be required to remain as a sanction, pursuant to R. 1:10. Defense counsel asked for a mistrial, asserting that G.B.'s continued presence on the jury had the capacity to "infect[] the entire panel." Ibid. The trial judge reasoned that the instructions to the panel that they were not to discuss the case among themselves, and were obligated to report any incidents to the contrary, would suffice. Id. at 179, 821 A.2d 1139.
The trial judge then conducted a brief hearing in open court, outside the presence *329 of the other jurors, and advised G.B. that she would be required to remain on the jury as a sanction; G.B. was then also specifically instructed not to have any "conversation with any other member of this jury regarding this case or regarding your service." Id. at 179, 821 A.2d 1139. At that time, G.B. also confirmed she had had no conversation with another juror who had also sought to be excused after the jury was sworn. Id. at 180, 821 A.2d 1139. At the end of the day, G.B. was excused, following which the jury found defendant guilty. Ibid.
In Tyler, the Court observed that the problem generated by the judge's retention of G.B. on the jury (even though she would not be deliberating or conversing with the other jurors) could have been resolved if the judge had been receptive to G.B.'s request to be heard during the selection process, or by removing G.B. after the jury had been sworn pursuant to R. 1:8-2(d)(1). Id. at 181-82, 821 A.2d 1139. Since the trial judge took neither of these steps, defendant urged on appeal that the presence of this "outcast juror" infected the "jury's interactions" and "depriv[ed] him of a fair and impartial jury." Id. at 180, 821 A.2d 1139.
In a brief opinion, the unanimous Court in Tyler agreed with defendant and, in doing so, quoted with approval our earlier decision in State v. Wagner, 180 N.J.Super. 564, 435 A.2d 1190 (App.Div.1981)[6]:
There are times, even in the absence of prejudice to a defendant, when it is essential to insure future observance of a prescribed practice safeguard or the vindication of a fundamental principle that courts should not hesitate to reverse.
When the integrity of the process is at stake, prejudice is not a precondition to successfully asserting impairment of the fundamental right of proper jury selection.
[State v. Wagner, supra, 180 N.J.Super. at 567, 435 A.2d 1190].
....
When the integrity of the jury selection process has been compromised to the extent involved here, prejudice to defendant will be presumed. When the judge left G.B. in the jury box to punish her, defendant's constitutional right to a fair and impartial jury was compromised.
[State v. Tyler, supra, 176 N.J. at 182, 821 A.2d 1139.]
As a result, the Court held that defendant was entitled to a new trial.
While quite different from State v. Tyler, supra, we similarly conclude that the circumstances presented in this case also call into question the integrity of the jury selection process and, therefore, permit a presumption of prejudice. The trial judge's failure to secure through a proper voir dire an understanding of the ability of the seated jurors to remain on the jury for the time requiredbecause he was concerned that hardship requests would "snowball" and the time to select a jury increasedjeopardized, and ultimately damaged, the integrity of the process. We cannot condone the trial judge's decision to accelerate the selection process by disregarding his obligation to generate a flow of information from the panel sufficient to permit the knowing exercise of cause or *330 peremptory challenges.[7] Our judicial system does not permit the employment of a process that exalts economy over fairness. See State v. Fortin, supra, 178 N.J. at 629, 843 A.2d 974. Instead, the selection process must be designed so as to insure, to the greatest extent that the applicable statutes and rules permit, the production of a fair and impartial jury. Supported by the principles that emanate from the Court's holding in State v. Tyler, supra, 176 N.J. 171, 821 A.2d 1139, and our own decisions in State v. Dishon, supra, 297 N.J.Super. 254, 687 A.2d 1074, and State v. Wagner, supra, 180 N.J.Super. 564, 435 A.2d 1190, we conclude that the integrity of the selection process was violated by the trial judge's use of a bifurcated voir dire.
Reversed and remanded for a new trial.
NOTES
[1] An earlier indictment had been dismissed by the trial judge.
[2] As the Court indicated in State v. Brunson, supra, 101 N.J. at 136-37, 501 A.2d 145, "the right to exercise peremptory challenges was accorded to criminal defendants at common law and was accepted as part of the received common law in the early colonial and state courts," having been recognized in English law since the Fourteenth Century.
[3] The Court observed that this detective "was an important State's witness whose credibility was under direct attack," and even though the juror "may have been wholly sincere in his statement that his long and close friendship with [the detective] would have no bearing whatever on the issue of credibility," the Court expressed that it found it "difficult to accept [that contention] for it would run[] counter to human nature." Id. at 160, 203 A.2d 1.
[4] That is, five of the fourteen satisfactory jurors (36%) were excused for hardship reasons. If we assume from this sampling that 36% of the entire panel also possessed hardships sufficient to warrant their excusal for cause, then it could also be assumed that 36% of defendant's first eight peremptory challenges were exercised unnecessarily. 36% of eight is 2.88 or, roughly, three jurors.
[5] This analysis does not take into account Justice Handler's persuasive comments that the injury caused by the loss of a peremptory challenge, particularly at a stage when defendant has few remaining, progresses geometrically and not merely arithmetically, State v. Bey, supra, 112 N.J. at 201-02, 548 A.2d 887, since it appears that a majority of the Court has never accepted this belief.
[6] In State v. Wagner, we reversed a conviction where the jury was selected by a means not authorized by statute. Instead of replacing jurors who had been excused by having a court officer remove the new juror's number from a box, as required by N.J.S.A. 2A:74-1 (since superseded by N.J.S.A. 2B:23-2), the trial judge in Wagner "replaced them by calling upon other jurors seated in various rows in the courtroom by starting at one point in the courtroom `and going right down the row.'" 180 N.J.Super. at 566, 435 A.2d 1190.
[7] We are not unmindful of recent criticism of the use of peremptory challenges. The Supreme Court observed in State v. W.A., supra, 184 N.J. at 56, 875 A.2d 882 that their use in our judicial system has been viewed as "increasingly anomalous." Indeed, a committee created by our Supreme Court was designed to thoroughly investigate voir dire and peremptory challenge procedures. This Special Committee on Peremptory Challenges and Jury Voir Dire rendered its report on May 16, 2003, recommending a reduction in the number of peremptory challenges afforded to litigants. Notwithstanding, as the Court said in State v. W.A., supra, 184 N.J. at 56, 875 A.2d 882, "it is against the backdrop of a scheme that allows peremptory challenges that this case must be decided."