**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3125-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

FRENCH G. LEE,

    Defendant-Appellant.

_____

> Argued March 18, 2025 – Decided April 4, 2025
>
> Before Judges Firko, Bishop-Thompson, and Augostini.
>
> On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 19-01-0012.
>
> Tamar Y. Lerer, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Tamar Y. Lerer, of counsel and on the briefs).
>
> Thomas M. Caroccia, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Thomas M. Caroccia, of counsel and on the briefs).

John J. Pease, III (Morgan Lewis & Bockius, LLP) of the Pennsylvania bar, admitted pro hac vice, argued the cause for amicus curiae The Innocence Project, Inc. (Morgan Lewis & Bockius, LLP, attorneys; John J. Pease, III, Bradie R. Williams (Morgan Lewis & Bockius, LLP) of the Pennsylvania bar, admitted pro hac vice, Steven Strauss (Morgan Lewis & Bockius, LLP) of the Pennsylvania bar, admitted pro hac vice, Bryan P. Goff (Morgan Lewis & Bockius, LLP) of the New York bar, admitted pro hac vice, and Brian A. Herman, of counsel and on the brief; M. Chris Fabricant (Innocence Project, Inc.) of the New York bar, admitted pro hac vice, and Tania Brief (Innocence Project, Inc.) of the New York bar, admitted pro hac vice, on the brief).

American Civil Liberties Union of New Jersey Foundation, attorneys for amicus curiae Adele Quigley-McBride (Alexander Shalom and Jeanne LoCicero, on the brief).

PER CURIAM

A jury convicted defendant French G. Lee of two counts of third-degree burglary, N.J.S.A. 2C:18-2(a)(1). The primary evidence used to convict defendant were fingerprints found at the crime scene—Wing King restaurant—and video footage from surveillance cameras. First, with the benefit of guidance provided by State v. Olenowski, 253 N.J. 133 (2023), we conclude the court erred by not conducting an N.J.R.E. 104 hearing and considering the reliability

2

A-3125-22

of the fingerprint analysis evidence under <u>Daubert</u>[1] and N.J.R.E. 702.  Second, the State elicited testimony from a law enforcement officer, and the owner and operator of Wing King, Michael Babcock, who both improperly invaded the province of the jury by narrating the video evidence, including their testimony that it appeared to be the same individual entering the restaurant on both occasions.  Third, the court should have voir dired potential jurors about their knowledge and views on fingerprint evidence during jury selection.

We hold that the admission of the fingerprint evidence and testimony about the video evidence, and the court's failure to ask potential jurors an open-ended question on their views on fingerprint evidence violated defendant's right to a fair trial.  Therefore, we reverse defendant's convictions and remand for further proceedings and more detailed findings by the court on the fingerprint evidence addressing each of the discrete factors set forth in <u>Daubert</u>, as adopted with certain conditions by our Supreme Court in the matter of <u>In re Accutane</u> <u>Litig.</u>, 234 N.J. 340 (2018), and for a new trial on all issues.

---

[1] <u>Daubert v. Merrell Dow Pharms. Inc.</u>, 509 U.S. 579 (1993).

I.

The criminal charges against defendant arose out of two incidences that occurred on September 28 and 30, 2018. We summarize the facts from the evidence presented at trial.

A. The September 28, 2018 Incident.

At 3:47 a.m. on September 28, 2018, Babcock received a call from his security company advising that someone had broken into Wing King, located in Moorestown. After arriving at Wing King a few minutes later, Babcock noticed the alarm was on and a window screen was on the ground. Babcock reviewed the surveillance video, which showed that the suspect had climbed in through a window at 3:45 a.m., walked to the counter area, and took a change bag, which contained $168 in cash.

Officer Daniel Pascal responded to Wing King a few minutes later to investigate. Pascal found two kitchen windows were open with a screen removed from one of the windows. Pascal further observed footprints and fingerprints on the prep table.

Detective Jason Burk also responded that day shortly after Pascal. Burk noticed the screen was pulled from the window outside the kitchen, which he determined was the likely point of entry. Burk entered Wing King and spoke to

4 <span>A-3125-22</span>

Babcock, who showed him the surveillance video of the incident. Burk testified that the video:

> show[s] the suspect walking up the stairs from the pizza oven area where that window is located and going to the area where the cash register is, reaching underneath and pulling out—it looked like a bank bag out and then turning around and going back out the way he came.

Burk then noticed a latent fingerprint on the face of one of the pizza ovens and a footprint with a "Timberland boot[-]type shoe print" on one of the prep tables near the window that had the screen removed. Burk photographed, scaled, and processed the fingerprint on the oven.

## B. The September 30, 2018 Incident.

On September 30, 2018, at approximately 4:50 a.m., Babcock received another call from his security company about a break-in at Wing King. Babcock again viewed the surveillance video to identify the intruder and testified it "looked like the same individual that was there two days prior decided to come back," but did not recognize the suspect personally. In the video, at 4:47 a.m., the suspect went to the safe where the change bag was located two days prior, apparently did not find the change bag to steal, and attempted to lift and open up the cash register but was unable to do so. The video showed the suspect left empty-handed.

On September 30, 2018, at 4:51 a.m., Corporal William Mann received a call to respond to a possible break-in at Wing King and arrived within "a minute or two." When Mann arrived at the scene, he noticed the alarms were blaring, but did not observe any signs of forced entry. Mann then went inside and reviewed the surveillance video with Babcock and proceeded to call Burk to process the scene. Mann explained that one camera angle showed the suspect entering Wing King from the same area as on September 28, 2018, and returning to the cash register area.

Thirty minutes after Mann arrived at the scene, Burk showed up. Burk proceeded to assess the scene from the outside and then went inside and watched the surveillance video with Babcock. Burk testified about the video and stated:

> the video showed the suspect lifting up the cash register and he was putting his hands—he was clearly not wearing gloves and he was putting his hands underneath the cash register trying to, I can only assume, trying to look for a release button or something to open up the cash register.

Burk deduced that since the suspect was not wearing gloves, he would likely be able to get fingerprints from the cash register.

Burk photographed, scaled, and processed four latent fingerprints from the bottom of the register. All five of the fingerprints (one from September 28 and four from September 30) were sent to the New Jersey State Biometric Unit

6

Lab for a comparison within the Automated Fingerprint Identification System (AFIS), the State fingerprint database. Burk testified that he tested the screen from September 28 for DNA but was unable to collect any due to the rainy conditions that night.

Burk testified that it was his belief that the same suspect entered Wing King on both dates because he appeared to wear the same two-toned sweatshirt, with a dark-colored sleeve area, and a light-colored chest and hood area. Burk also stated the suspect had a "black object" on his hip in both videos, which Burk believed was a cell phone or cell phone case. On October 1, 2018, police received notice that the AFIS database had returned a match on the fingerprints from the crime scene as belonging to defendant.

On January 3, 2019, a grand jury indicted defendant, charging him with two counts of third-degree burglary, N.J.S.A. 2C:18-2(a)(1). On March 22, 2019, defendant was arrested.

Before trial, defendant moved to bar the State from introducing expert latent fingerprint analysis evidence based on ACE-V[2] methodology at trial as

---

[2] ACE-V is an acronym referring to the four phases of the methodology: analysis, comparison, evaluation, and verification. ACE-V "aids in sequential assessment of latent fingerprint and comparison with the exemplar fingerprint." Aakarsh Malhotra et al., Understanding ACE-V Latent Fingerprint Examination

unreliable.  Defendant argued the reliability of latent fingerprint analysis is not

generally accepted by the scientific community and "is vulnerable to error."  The

State opposed defendant's motion and countered that ACE-V methodology is

reliable.  The court summarily denied defendant's motion, without conducting

---

Process via Eye-Gaze Analysis, IEEE Transactions on Biometrics, Behavior, and Identity Science 2 (2020).

> ACE-V is a four-step sequential process, where examiners perform specific tasks. The four stages and the tasks performed are . . . described as follows:
>
> (1) Analysis (A):  [The] [a]nalysis stage begins with assessing latent fingerprint towards the suitability and sufficiency for comparison.  The examiner performs a manual markup of the established features . . . with personal comments (notes) . . . .
>
> (2) Comparison (C):  In the comparison stage, [the] examiner marks features in the exemplar fingerprint and compares with the features of the latent fingerprint.
>
> (3) Evaluation (E):  From the inferences of comparison stage, the examiner makes a conclusion decision of either individualization, exclusion, or inconclusive.
>
> (4) Verification (V):  A subsequent examiner performs an independent examination of fingerprints using ACE procedure.
>
> [Ibid.]

an N.J.R.E. 104 hearing. The court ruled that the ACE-V methodology "has been utilized and upheld as reliable by [c]ourts throughout this [S]tate" and no case was presented to the contrary. The court concluded an N.J.R.E. 104 hearing was unnecessary.

Defendant also moved, in the alternative, to preclude the State's fingerprint analysis expert from testifying that there was a fingerprint match or identification. The court granted defendant's motion, in part, and directed the expert to qualify his opinion "with language such as within a reasonable degree of probability as opposed to a 100[%] match."

Defendant also requested that prospective jurors be voir dired about their opinions regarding the reliability of fingerprint evidence. The State objected. The court denied defendant's request and no open-ended question regarding fingerprint analysis was posed during voir dire of the prospective jurors.

The State moved to limit the scope of admissible testimony as to the officer's description of the suspect and the race or nationality of the suspect on the two surveillance videos. The court conducted a pre-trial hearing on narration of the surveillance videos at trial. The court granted the State's motion, barring the officers from testifying as to defendant being a "[h]ispanic or a black male" but allowed questioning about the investigation and how the officers "came up

with the profile."  The court then reconsidered its previous ruling on the issue of expert fingerprint analysis testimony and modified its ruling to allow the expert to testify as to the "reasonable probability" of the fingerprint identification.

The trial spanned five non-consecutive days.  Pascal testified on behalf of the State.  On direct examination, Pascal was asked to describe what the suspect looked like based on his viewing of the September 28, 2018 surveillance video.  Pascal testified, "I believe at the time it was a white or [h]ispanic male wearing a two-tone sweat jacket with camo pants."

Mann testified on behalf of the State about responding to Wing King on September 30, 2018.  Mann stated that he did not see any signs of forced entry when he arrived.  Mann explained that he went inside Wing King with Babcock, watched the surveillance videos, and then called Burk.

Babcock testified for the State as follows:

> [State]:  Did you go inside with another officer?
>
> [Babcock]:  I can't recall whether I did or I didn't at first but eventually, yeah, I was inside with all the officers.
>
> [State]:  Did you check the surveillance again?
>
> [Babcock]:  Yeah.
>
> [State]:  Did you see anything on the surveillance?

[Babcock]: Yeah, looked like the same individual that was there two days prior decided to come back.

[State]: But did you recognize that guy, or the suspect, to say, like, hey, that's Tom?

[Babcock]: No. No.

Burk also testified for the State. In his testimony, Burk stated:

[State]: What's the first thing you [did] when you arrive[d] on September 30, 2018?

[Burk]: The same as I did the first time. I assessed the scene from the outside then I went in and spoke with the owner and watched the video again.

[State]: Based on what you viewed on the video, what steps did you take?

[Burk]: So, the video showed the suspect lifting up the cash register and he was putting his hands—he was clearly not wearing gloves and he was putting his hands underneath the cash register trying to, I can only assume, trying to look for a release button or something to open up the cash register.

[State]: Did it look like the suspect had gloves on?

[Burk]: He did not have gloves on.

[State]: The suspect's clothing, was it similar in any way to the suspect from two days earlier?

[Burk]: Yes. The shirt was similar and so was the phone on the hip.

[State]: When you say a phone?

11

[Burk]:  It looks like a phone case on his right hip.

[State]:  Like a black object?

[Burk]:  Yes, a black object.

[State]:  You can't be sure, though, that it's a phone?

[Burk]:  Can't be sure it's a phone, but it's a phone. There was a black object on his right hip.

[State]:  And that black object, a similar black object was present on both September 28th and September 30th?

[Burk]:  It was.

[State]:  Is there any other video besides up by the counter that you viewed when you first arrived on scene?  Like another camera angle inside the business?

[Burk]:  Towards the kitchen.

[State]:  Did you see the suspect touching anything in the kitchen?

[Burk]:  No, not at that point.

[State]:  When you looked at that video in the kitchen did it give you any opinion as to the point of entry and exit?

[Burk]:  It would have been the same exact point of entry.  The same window as before.

Lieutenant Michael Wiltsey of the Burlington County Prosecutor's Office testified on behalf of the State as an expert in the field of fingerprint collection,

preservation, comparison, and identification. Wiltsey described the ACE-V methodology, which he uses to compare fingerprints, and opined that the "science of fingerprints" allows him "to determine source identification," meaning "in [his] opinion that the two prints originated from the same source." Wiltsey concluded that "all four of these latent impressions were identified as originating from the same source as the exemplars of [defendant]." Wiltsey added that he identified each latent print as a specific "finger" identifying defendant.

The State asked Wiltsey if defendant made the latent impressions contained on the slide of latent prints he reviewed, and Wiltsey responded the impressions matched defendant. Wiltsey explained that his conclusions were independently reviewed by a verifier. In his experience, Wiltsey testified he has never been involved in a situation where the verification process resulted in someone refuting the findings of the original examiner, and that "in some studies that have included the verification process, they show that the error would be caught."

Defendant did not testify and did not present any witnesses. The jury found defendant guilty on both counts of burglary. The court sentenced defendant on both counts to six years' imprisonment, with an extended two-year

13

period of parole ineligibility, with both sentences to run concurrently with one another. The court also imposed restitution and fines. Two weeks later, the court held another sentencing hearing to clarify some of its rulings and issued an amended judgment of conviction.

## II.

Defendant now appeals from his convictions. He advances three arguments on this appeal, with subparts, which he articulates as follows:

> POINT I
>
> THE TRIAL COURT'S IMPROPER HANDLING OF FINGERPRINT EVIDENCE DENIED DEFENDANT A FAIR TRIAL AND REQUIRES REVERSAL OF HIS CONVICTIONS.
>
> A. Fingerprint Analysis Is A Subjective Technique That Is Vulnerable To Error.
>
> B. Because The State Failed To Carry Its Burden To Demonstrate The Reliability Of Fingerprint Analysis That Originates With A Database Search, No Fingerprint Analysis Testimony Should Have Been Admitted At Trial.
>
> C. The Failure To Properly Address The Fingerprint Testimony At Voir Dire, To Limit The Examiner's Testimony At Trial, And To Charge The Jury On The Limits Of Such Testimony Deprived Defendant Of His Rights To An Impartial Jury And A Fair Trial.

i.  The Refusal To Voir Dire Prospective Jurors About Their Preconceived Ideas About The Reliability Of Fingerprint Examination Requires Reversal.

ii. The Fingerprint Examiner's Testimony Strayed Beyond The Boundaries Of Reliability And Relayed Testimonial Hearsay, Requiring Reversal.

iii. The Trial Court's Refusal To Charge The Jury On How To Consider The Reliability Of The Fingerprint Comparison Requires Reversal.

D.  The Inappropriate Handling Of The Fingerprint Evidence Requires Reversal Of Defendant's Conviction.

Point II

INAPPROPRIATE LAY[]OPINION TESTIMONY THAT THE VIDEO OF EACH INCIDENT DEPICTED THE SAME PERPETRATOR REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.

POINT III

IMPOSITION BOTH OF A DISCRETIONARY EXTENDED TERM AND A DISCRETIONARY PAROLE DISQUALIFIER WAS INAPPROPRIATE AND RESULTED IN AN EXCESSIVE SENTENCE.

We granted leave to The Innocence Project, Inc., to file an amicus brief, which urges us to consider: (1) whether voir dire should be conducted to determine whether prospective jurors are biased in favor of the "infallibility" of

15

fingerprint examiner opinions; (2) whether appropriate "guardrails" should be imposed on expert testimony regarding fingerprint analysis; and (3) whether the Model Criminal Jury Charges comport with established error rates in the field of fingerprint comparison analysis. We also granted leave to the American Civil Liberties Union of New Jersey Foundation to file an amicus brief, which urges us to consider:

> (1) that ordinary people form misconceptions about forensic science through learning what occurs outside their awareness; and
>
> (2) common misconceptions plague ordinary people's view of forensic evidence because people believe forensic analysis is objective, was created by scientists, is rarely inaccurate, reliable, commonly available, and can tell you whether a specific person committed a crime.

A.

We afford substantial deference to a trial court's evidentiary rulings. Hrymoc v. Ethicon, Inc., 254 N.J. 446, 463 (2023). As a result, we review evidentiary rulings for an abuse of discretion. Ibid. The trial court's evidentiary rulings must be upheld, "unless 'the trial court's ruling was so wide of the mark that a manifest denial of justice resulted.'" State v. Cotto, 471 N.J. Super. 489, 531 (App. Div. 2022) (quoting State v. Kuropchak, 221 N.J. 368, 385-86 (2015)).

16

Our Supreme Court has instructed that in determining the admissibility of scientific expert testimony in civil, and now criminal cases, our trial courts must utilize a "methodology-based test for reliability" similar to the standard set forth by the United States Supreme Court in Daubert. Accutane, 234 N.J. at 397. This standard is as follows:

> Our view of proper gatekeeping in a methodology-based approach to reliability for expert scientific testimony requires the proponent to demonstrate that the expert applies his or her scientifically recognized methodology in the way that others in the field practice the methodology. When a proponent does not demonstrate the soundness of a methodology, both in terms of its approach to reasoning and to its use of data, from the perspective of others within the relevant scientific community, the gatekeeper should exclude the proposed expert testimony on the basis that it is unreliable.
>
> [Id. at 399-400.]

Applying this standard, our courts must consider "whether an expert's reasoning or methodology underlying the testimony is scientifically valid" and "whether that reasoning or methodology properly can be applied to facts in issue." Id. at 397-98 (citing Daubert, 509 U.S. at 591, 594-95; Rubanick v. Witco Chem. Corp., 125 N.J. 421, 449 (1991)).

The trial court's role is not to "substitute its judgment for that of the relevant scientific community," but "to distinguish scientifically sound

reasoning from that of the self-validating expert, who uses scientific terminology to present unsubstantiated personal beliefs."  Id. at 390 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 414 (1992)).  Thus, experts "must be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable."  Id. at 382 (quoting Landrigan, 234 N.J. at 417).  Moreover, when an expert relies on scientific or medical studies, "the trial court should review the studies, as well as other information proffered by the parties, to determine if they are of a kind on which such experts ordinarily rely," and if they are "derived from a sound and well-founded methodology that is supported by some expert consensus in the appropriate field."  Landrigan, 127 N.J. at 417.

When applying this standard, our judges should now address the multiple Daubert factors, a "'helpful—but not necessary or definitive—guide' for trial courts in New Jersey" to follow when assessing the reliability of scientific or technical expert testimony.  Olenowski, 253 N.J. at 149 (quoting Accutane, 234 N.J. at 398).  These factors are as follows:

> (1) Whether the scientific theory can be, or at any time has been, tested;
>
> (2) Whether the scientific theory has been subjected to peer review and publication, noting that publication is one form of peer review but is not a "sine qua non";

(3) Whether there is any known or potential rate of error and whether there exist any standards for maintaining or controlling the technique's operation; and

(4) Whether there does exist a general acceptance in the scientific community about the scientific theory.

[Accutane, 234 N.J. at 398 (citing Daubert, 509 U.S. at 593-95).]

The first enumerated Daubert factor—testability—relates closely to the dual components of the third factor, error rate and standards. Testability is "a key question" that entails whether a theory or technique "can be (and has been) tested." Daubert, 509 U.S. at 593.

The second Daubert factor—peer review and publication—is significant because submission of a methodology "to the scrutiny of the scientific community is a component of 'good science'" and "increases the likelihood that substantive flaws in methodology will be detected." Ibid.

The third Daubert factor concerns both the known or potential rate of error in testing the methodology as well as any standards for maintaining or controlling the methodology's operation. Id. at 594. As the Court noted in Daubert, a trial court "ordinarily" should account for the "known or potential rate of error" of a methodology. Ibid. In addition, a methodology is more reliable if it is governed by well-established standards for operation. Ibid. See

19

also <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 154-57 (1999) (rejecting as inadmissible an expert who had not consistently adhered to a protocol with appropriate standards).

Lastly, the fourth <u>Daubert</u> factor—general acceptance—(the former test of <u>Frye v. United States</u>, 293 F. 1013 (D.C. Cir. 1923) is no longer the dispositive test since the Court has adopted the multifactor <u>Daubert</u> approach) is still pertinent. <u>Daubert</u>, 509 U.S. at 594-96; <u>Accutane</u>, 234 N.J. at 398.

As the Supreme Court stated in <u>Accutane</u>, 234 N.J. at 398, and again in <u>Olenowski</u>, 253 N.J. at 149, these specific factors are not a rigid set of considerations for ascertaining the reliability of a proffered expert's methodology. Nonetheless, they provide an important framework for guiding the analysis. The trial court's consideration of each of these factors is integral to our court's review of whether the trial court abused its discretion in concluding whether an expert's methodology was sufficiently reliable to be admitted to a jury. <u>Accutane</u>, 234 N.J. at 391.

N.J.R.E. 702 allows an expert who is qualified by knowledge, skill, experience, training or education to testify in the form of an opinion if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence. The "well-known prerequisites" to this rule are:

"(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror;

(2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and

(3) the witness must have sufficient expertise to offer the intended testimony."

Hisenaj v. Kuehner, 194 N.J. 6, 15 (2008).

"If a party challenges an expert opinion pursuant to N.J.R.E. 702, the 'trial court should conduct a hearing under [N.J.R.E. 104] concerning the admissibility of the proposed expert testimony.'" State v. J.R., 227 N.J. 393, 409 (2017) (alteration in original) (quoting State v. Torres, 183 N.J. 554, 567 (2005)). At such hearing, the proponent of the expert "may demonstrate that the expert's methodology meets the benchmark of N.J.R.E. 702, and the opposing party may challenge the reliability of the expert's opinion." Id. at 410. The trial court's evidentiary ruling that a witness is qualified to present expert testimony under N.J.R.E. 702 is reviewed for abuse of discretion and should be reversed only "for manifest error and injustice." State v. Rosales, 202 N.J. 549, 562-63 (2010); (quoting State v. Jenewicz, 193 N.J. 440, 455 (2008)); see also State v. Townsend, 186 N.J. 473, 493 (2006) (same).

21

After Olenowski, expert testimony may be found adequately reliable for admission in criminal cases only "if it is based on a sound, adequately-founded scientific methodology involving data and information of the type reasonably relied on by experts in the scientific field." 253 N.J. at 146 (quoting Rubanick, 125 N.J. at 449). "In determining if the scientific methodology is sound and well-founded, courts should consider whether others in the field use similar methodologies." Ibid. (quoting Rubanick, 125 N.J. at 449) Thus, the focus of the review is on the scientific community's acceptance of the proposed expert's methodology and underlying reasoning. Accutane, 234 N.J. at 396-97.

The analysis also necessitates that there be a "proper fit" insofar as the expert testimony must be sufficiently tied to the facts of the case in order to aid the jury in resolving the matters at issue. Id. at 398 (citing Rubanick, 125 N.J. at 449 ("The expert must possess a demonstrated professional capability to assess the scientific significance of the underlying data and information, to apply the scientific methodology, and to explain the bases for the opinion reached.") (emphasis in original)).

In the matter under review, defendant contends the court abused its discretion in admitting Wiltsey's testimony without first determining whether his opinion satisfied the Daubert standard, as required by Olenowski. Defendant

maintains the court ignored multiple governmental studies and reports he submitted addressing whether fingerprint analysis is reliable enough to be presented in courtrooms for a jury to consider in criminal trials.

For example, defendant cited to a study commissioned by the Obama Administration that showed the error rate was "one in 306" and another study found the error rate was "one in [eighteen]," suggesting that "approximately [5%] or more of fingerprint identifications are false positives."  Defendant avers that the reliability of latent fingerprint analysis is not generally accepted by the scientific community and the ACE-V methodology fails the Daubert and Olenowski reliability factors of testing, standards, error rates, and peer review.

Here, these studies and defendant's arguments were not considered by the court when it issued its ruling.  The court concluded it was going to admit evidence of the ACE-V method, which the court found was "sufficiently reliable," and that no case found to the contrary.

Based upon our review of the record, the first prong of N.J.R.E. 702 is satisfied because there is no dispute that fingerprint collection, preservation, comparison, and identification is beyond the ken of the average juror.  The third prong of N.J.R.E. 702 was addressed by the court's finding that Wiltsey had sufficient expertise to opine on fingerprint analysis and evidence.

23

But the court did not address the second prong of N.J.R.E. 702—whether Wiltsey's opinion was based on a reliably sound methodology—and instead focused on the historical acceptance of fingerprint evidence without considering the studies and reports defendant presented. As we have previously stated, "[a] long line of decisions uniformly in favor of a legal proposition suggests that a legal proposition is generally accepted. We are mindful, however, that in science, the repetition of authority does not automatically establish reliability for purposes of a Frye (now Daubert) hearing." State v. Pickett, 466 N.J. Super. 270, 316 (App. Div. 2021).

We have an overarching concern that the court's analysis failed to sufficiently adhere to the Daubert standard and the principles set forth by our Supreme Court in Olenowski and Accutane. Put succinctly, Wiltsey's testimony was admitted without the fundamental principles of ACE-V methodology being challenged beforehand. Defendant contends the studies and reports it submitted to the court demonstrate that ACE-V is "a subjective discipline without a uniform set of guidelines about when a fingerprint examiner should declare a match" and the "standard is simply you know it when you see it and that's a problem."

Defendant contends the error rates for fingerprint analysis "skyrockets" when close, non-matches are considered, as was the case here. Defendant maintains that close, non-matches arise when "two prints from different people have many common features and few discernible dissimilar features," which may increase the risk of a false identification.

Moreover, the court's conclusion that ACE-V is reliable because it has been used "for over 100 years" and other courts have determined it to be reliable does not comport with the Daubert analysis. We accordingly reverse and remand this matter to the court to conduct a Daubert hearing and to provide a detailed and complete factor-by-factor Daubert analysis. We intimate no views on the appropriate outcome.

B.

Next, defendant argues the court abused its discretion by excluding defendant's following proposed jury voir dire question: "Do you believe that fingerprint analyses are reliable, why or why not?" Defendant proffers that this question was necessary to ascertain if "prospective jurors had a preexisting and inflated belief in the reliability of fingerprints." The State objected on the basis the question has a potential to engender within the jury certain preconceived

notions about the reliability of that evidence. The court excluded the question without stating a reason for its ruling.

Criminal defendants have the constitutional right to be tried before an impartial jury. U.S. Const. amends. VI, XIV; N.J. Const. art. I, ¶ 10; State v. Little, 246 N.J. 402, 414 (2021); State v. Loftin, 191 N.J. 172, 187 (2007); State v. Fortin, 178 N.J. 540, 575 (2004); State v. Williams, 113 N.J. 393, 409 (1988); State v. Bey, 112 N.J. 45, 75 (1988). Jury voir dire is a key component to safeguarding that right. Fortin, 178 N.J. at 575; State v. Tyler, 176 N.J. 171, 181 (2003); State v. Papasavvas, 163 N.J. 565, 584 (2000).

"The voir dire should be probing, extensive, fair and balanced." Papasavvas, 163 N.J. at 585. Nevertheless, "a trial court's decisions regarding voir dire are not to be disturbed on appeal, except to correct an error that undermines the selection of an impartial jury." State v. Winder, 200 N.J. 231, 252 (2009).

The conduct of voir dire is left to the broad discretion of the trial court, and the court's exercise of its discretion generally will not be disturbed on appeal. Little, 246 N.J. at 413; State v. Wakefield, 190 N.J. 397, 496-97 (2007); State v. Simon, 161 N.J. 416, 466, 475 (1999); State v. DiFrisco, 137 N.J. 434, 459 (1994); Williams, 113 N.J. at 410; State v. Singletary, 80 N.J. 55, 62 (1979).

26

"The wide latitude afforded trial courts in the determination of a prospective juror's qualifications stems from the inability of appellate courts to appreciate fully the dynamics of a trial proceeding." DiFrisco, 137 N.J. at 459; Simon, 161 N.J. at 466.

> Decisions concerning the potential bias of prospective jurors are primarily subjective in nature. They require at bottom a judgment concerning the juror's credibility as he responds to questions designed to detect whether he is able to sit as a fair and impartial trier of fact. Consequently, such evaluations are necessarily dependent upon an observation of the juror's demeanor during the course of voir dire observations which an appellate court is precluded from making.
>
> To be sure, in certain circumstances a venire[person's] potential for bias is sufficiently indicated by his past experiences that a refusal to excuse for cause will necessitate a reversal. . . . In the majority of cases, however, whether or not to dismiss the challenged juror is heavily dependent upon subjective evaluations of his credibility.
>
> . . . .
>
> . . . Inasmuch as the trial judge observed the venire[person]'s demeanor, he was in a position to accurately assess the sincerity and credibility of . . . statements, and we should therefore pay due deference to his evaluation . . . .
>
> [Singletary, 80 N.J. at 63-64 (citations omitted).]

"Probing inquiries are essential in uncovering hidden biases."  Williams, 113 N.J. at 424.  However, there are "[n]o hard-and-fast rules" to determining whether a removal for cause is proper.  DiFrisco, 137 N.J. at 460.  The decision is left to the trial court's sound discretion.  Ibid.

"Voir dire procedures and standards are traditionally within the broad discretionary powers vested in the trial court and 'its exercise of discretion will ordinarily not be disturbed on appeal.'"  Papasavvas, 163 N.J. at 595 (quoting State v. Jackson, 43 N.J. 148, 160 (1964)).  "'The purpose of voir dire is to ensure an impartial jury' by detecting jurors who cannot fairly decide a matter because of partiality or bias."  State v. O'Brien, 377 N.J. Super. 389, 412 (App. Div. 2004) (quoting State v. Martini, 131 N.J. 176, 210 (1993)).

> "[T]here is no particular litany required for the jury voir dire," and the court is not obligated "to ask any particular question or indulge the defendant's requests absolutely."  Appellate review is generally limited to determining whether "the overall scope and quality of the voir dire was sufficiently thorough and probing to assure the selection of an impartial jury."
>
> [Id. at 412-13 (alteration in original) (first quoting State v. Lumumba, 253 N.J. Super. 375, 393-94 (App. Div. 1992); and then quoting State v. Biegenwald, 106 N.J. 13, 29 (1987)).]

"While . . . the trial judge possesses 'broad discretionary powers in conducting voir dire . . .[,]' our Supreme Court has also indicated that it will not 'hesitate[]

28

to correct mistakes that undermine the very foundation of a fair trial—the selection of an impartial jury.'" State v. Tinnes, 379 N.J. Super. 179, 184 (App. Div. 2005) (quoting Fortin, 178 N.J. at 575).

"Whether or not to inquire of prospective jurors about attitudes concerning substantive defenses or other rules of law which may become implicated in a trial or in the charge is within the discretion of the trial court." State v. Murray, 240 N.J. Super. 378, 393 (App. Div. 1990). "Questions on subjects covered in the court's charge should be rarely allowed." Ibid. But, "[g]enerally, a trial court's decisions regarding voir dire are not to be disturbed on appeal, except to correct an error that undermines the selection of an impartial jury." Winder, 200 N.J. at 252.

Here, the jury selection procedure we described above did not inquire into prospective jurors' views on fingerprint analysis evidence. The court's refusal to question jurors was a "serious error" and a "significant component of the deficiencies" at this trial in light of the significance of the fingerprint evidence. While no voir dire is "perfect," in this matter, on remand, we direct the court to inform the prospective jurors that fingerprint evidence will be presented in the case and to question them on whether their knowledge, and perhaps

preconceived notions about fingerprint evidence, may impact their ability to be fair and impartial jurors.  Martini, 131 N.J. at 211.

### III.

Next, defendant argues the court erred in admitting lay opinion testimony regarding the surveillance videos.  Our Supreme Court has set forth certain rules governing what is and is not permissible when a witness narrates video evidence when that witness did not observe the events in real time.  See State v. Watson, 254 N.J. 558, 600-01 (2023).  The Watson Court has explained "that [N.J.R.E.] 701, 602, and 403 in tandem provide the proper framework to assess video narration evidence by a witness who did not observe events in real time."  Id. at 600.  The Watson Court then set forth four principles to guide the admission of narrative testimony concerning video evidence.  In that regard, our Supreme Court explained:

> First, neither the rules of evidence nor the case law contemplates continuous commentary during a video by an investigator whose knowledge is based only on viewing the recording.  To avoid running commentary, counsel must ask focused questions designed to elicit specific, helpful responses.  "What do you see?" as an introductory question misses the mark.
>
> Second, investigators can describe what appears on a recording but may not offer opinions about the content.  In other words, they can present objective, factual comments, but not subjective interpretations.

Third, investigators may not offer their views on factual issues that are reasonably disputed. Those issues are for the jury to decide. So a witness cannot testify that a video shows a certain act when the opposing party reasonably contends that it does not. . . .

Fourth, although lay witnesses generally may offer opinion testimony under [N.J.R.E.] 701 based on inferences, investigators should not comment on what is depicted in a video based on inferences or deductions, including any drawn from other evidence.

[Id. at 603-04 (citations omitted).]

In giving specific examples, the Watson Court also explained that an investigator cannot say "that's the defendant" while describing video evidence to a jury. Id. at 604.

In addition, the witness "cannot offer opinions on the content of a recording or comment on reasonably disputed facts." Ibid. "In other words, they can present objective, factual comments, but not subjective interpretations." Id. at 603. Thus, "a witness cannot testify that a video shows a certain act when the opposing party reasonably contends that it does not." Ibid. In addition, there should not be "continuous commentary" during the video by an investigator whose knowledge is solely based on viewing the recording. Ibid.

"To avoid running commentary, counsel must ask focused questions designed to elicit specific, helpful responses." Ibid. Finally, the witness "should

not comment on what is depicted in a video based on inferences or deductions, including any drawn from other evidence." Id. at 604. "Consistent with those principles, an investigator who carefully reviewed a video in advance could draw attention to a distinctive shirt or a particular style of car that appear in different frames, which a jury might otherwise overlook." Ibid.

Applying these principles to defendant's trial, the State presented testimony from Burk and Babcock that violated N.J.R.E. 701, 602, and 403. The clearest violations were their testimonies concurring in their opinions that the September 28 suspect and the September 30 suspect were the same individual. Specifically, when the prosecutor questioned Babcock about whether he saw anything on the September 30 surveillance video, he answered, "Yeah, looked like the same individual that was there two days prior decided to come back." This testimony was improper under Watson because it is for the jury to draw that conclusion. 254 N.J. at 604.

In a similar vein, Burk testified that the suspect was the same individual on both dates. Burk reached this conclusion based on his review of surveillance video footage from both dates. In that regard, Burk was asked the following questions and gave the following answers:

> [State]: The suspect's clothing, was it similar in any way to the suspect from two days earlier?

[Burk]: Yes. The shirt was similar and so was the phone on the hip.

[State]: When you say a phone?

[Burk]: It looks like a phone case on his right hip.

[State]: Like a black object?

[Burk]: Yes, a black object.

[State]: You can't be sure, though, that it's a phone?

[Burk]: Can't be sure it's a phone, but it's a phone. There was a black object on his right hip.

[State]: And that black object, a similar black object was present on both September 28th and September 30th?

[Burk]: It was.

. . . .

[State]: The clothing that the suspect has on, describe to us what the . . . sweatshirt that he has on.

[Burk]: The sweatshirt, it appears to be a two-tone sweatshirt—the sleeves appear to be a different color than the body area which also appears to be the exact same clothing worn two nights prior.

[State]: In your opinion, the sweatshirt was of a similar design—

[Burk]: Of a similar design—

[State]: —as the sweatshirt from the 28th?

A-3125-22

[Burk]: Yes.

[State]:   Let me ask you this. As part of your investigation, did you compare screen grabs or video footage from each date?

[Burk]: Yes.

[State]:  Would it help to have a screen grab from the 28th of September, as well as this image here from September 30th?

[Burk]:  Absolutely.

[State]:   At this time I'm going to display in just a moment, S-23 in evidence which we were just looking at along with S-22 in evidence side by side.[3]

[Burk], the image that's on the left, what are we looking at there?

[Burk]:  The image on the left is from the 30th of the suspect kneeling behind the register.  The image on the right is from the 28th.  The suspect is kneeling next to the counter almost directly behind where he's at in the first picture.  They're both appearing to be wearing the same dark-colored sleeve, light-colored chest and hood area sweatshirt.

[State]:  Is there any other item or article of clothing or something on this person that drew your attention as part of your investigation, specifically looking at the image on the right?

---

[3]  S-22 is a screenshot of the suspect inside Wing King on September 28, 2018, and S-23 is a screenshot of the suspect inside Wing King on September 30, 2018.

A-3125-22

[Burk]: Yeah, the phone—the black object on his right hip.

. . . .

[State]: And I'll go back to—this is in evidence as S-22 from September 28, 2018. Could you note if you see—

[Burk]: You just zoomed right in on it. There it is right there. Same black object, right hip—right hip.

In summary, Babcock and Burk told the jury that the suspect was the same individual depicted in the surveillance video footage on both dates based on subjective interpretations and what they observed on the footage. Babcock had no personal knowledge of the break-ins and did not recognize the individual in the footage. And Burk improvidently testified that it appeared to be the same suspect in the surveillance video footage based on similar clothing and an object believed to be a phone in the same location on the individual's right hip. Those opinions addressing the identity of the suspect violated the rules established by our Supreme Court in Watson.

Moreover, the improper testimonies elicited from Babcock and Burk were compounded because they shared the same opinion that the intruder on both dates was the same individual. The issue of identity was key in this case. In short, Babcock and Burk reached the conclusion that the suspect was the same

35

person on September 28 and 30 based purely on their review of the surveillance video footage. The cumulative effect of the inadmissible testimonies deprived defendant of a fair trial.

IV.

In summary, the court's failure to conduct an N.J.R.E. 104 hearing on the reliability of the fingerprint analysis evidence as required by <u>Olenowski</u> and <u>Daubert</u> constitutes reversible error. Babcock and Burk rendered inadmissible lay opinion testimony regarding the surveillance videos in contravention of <u>Watson</u>. The court erred in not asking potential jurors during voir dire an open-ended question on their knowledge and views on fingerprint evidence. The cumulative effect of these errors deprived defendant of a fair trial. In combination, these errors require vacation of defendant's convictions and sentence, a remand for a N.J.R.E. 104 hearing under <u>Olenowski</u> and <u>Daubert</u>, and a new trial. Given those holdings, we need not consider defendant's or amici's other arguments.[4]

---

[4] Through <u>Rule</u> 2:6-11(d) letters, both parties raised <u>Erlinger v. United States</u>, 602 U.S. 821 (2024) arguments. Recently, the United States Supreme Court in <u>Erlinger</u> held "the Fifth and Sixth Amendments generally guarantee a defendant the right to have a unanimous jury find beyond a reasonable doubt any fact that increases his exposure to punishment." <u>Id.</u> at 828. The Court further stated, "[v]irtually 'any fact' that 'increase[s] the prescribed range of penalties to which

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

---

a criminal defendant is exposed' must be resolved by a unanimous jury beyond a reasonable doubt (or freely admitted in a guilty plea)."  Id. at 834 (alteration in original) (quoting Apprendi v. New Jersey, 530 U.S. 466, 490 (2000)).

We concluded in State v. Carlton that pursuant to Erlinger, "a unanimous jury must find beyond a reasonable doubt that all . . . of the [N.J.S.A. 2C:44- 3(a)] factual predicates are present, or the defendant must admit these predicates as part of a knowing and voluntary waiver of the right to a jury trial with respect to extended-term eligibility."  480 N.J. Super. 311, 329 (App. Div. 2024).  We further concluded in Carlton that the application of Erlinger's holding to the persistent offender statute, N.J.S.A. 2C:44-3(a), applies retroactively to pipeline cases.  Id. at 317; see also Griffith v. Kentucky, 479 U.S. 314, 328 (1987) (holding that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past").

We therefore afforded Erlinger's holding pipeline retroactivity to Erlinger's direct appeal of his sentence.  We reversed Carlton's extended term sentence and remanded for resentencing consistent with Erlinger.  Carlton, 480 N.J. Super. at 318.  We added that if the State seeks to impose an extended term sentence on remand, the trial court must hold a jury trial limited to the question of whether defendant is a persistent offender.  Ibid. See N.J.S.A. 2C:44-3(a). Here, on remand, the State shall have the burden of proving, beyond a reasonable doubt, the required persistent offender elements.  Carlton, 480 N.J. Super. at 356.